them, terminated his employment in order to prevent him from obtaining reinstatement of the Plan, coverage under it and/or asserting his rights under ERISA. In his request for relief, plaintiff seeks, *inter alia*, reinstatement of the LTD Plan, reinstatement of his employment and reinstatement of his coverage under the Plan. See Amended Complaint at §IV. See also Section B.1. *supra*.

Defendants argue that plaintiff's claim under §510 must be dismissed, citing <u>Dister v. Continental Group</u>, 859 F.2d 1108, 1111 (2d Cir. 1988), because "plaintiff must show more than a lost opportunity to accrue benefits to sustain a §510 claim."[12] Plaintiff cannot do this, defendants argue, because defendants purportedly had an unconditional right to terminate the LTD Plan and plaintiff's coverage under it at any time; because plaintiff has purportedly not alleged that defendants were obligated to reinstate the plan; and because plaintiff was not disabled and, therefore, could not have qualified for benefits under the plan at any time. Defendants' argument is misleading, incorrect and without merit.

The portion of <u>Dister</u> that defendants rely upon concerns the premise that no §510 claim lies where "'the loss of [] benefits was a mere consequence of, but not a motivating factor behind, a termination of employment.'" <u>Id.</u> (citations omitted). Neither <u>Dister</u> nor the cases it cites, nor <u>Sandberg v. KPMG, LLP</u>, 111 F.2d 331,334 (2d Cir. 1997) to which defendants also cite, stand for the proposition that defendants are apparently arguing – *i.e.*, that because defendants generally have the right under ERISA to terminate welfare benefit plans unilaterally and because plaintiff is seeking LTD coverage rather than asserting that he is currently entitled to LTD benefits, his §510 must fail.

---

[12] Defendants also cite cases in support of their argument that plaintiff's §510 claim must be dismissed that, defendants aver, stand for the proposition that ERISA does not prevent an employer from discriminating in the creation of employee benefits. Whatever the merit of defendants' interpretation of these cases, the point they are making is both confusing and irrelevant. Plaintiff does not claim that defendants discriminated in the creation of employee benefits.

29

Defendants' argument that a plaintiff must show current entitlement to benefits in order to bring a §510 claim is in direct conflict with the Supreme Court's decisions in Inter-Modal and Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989). In Inter-Modal, discussed above, the Court held that §510 protects rights to welfare benefit plans which offer benefits that "do not 'vest' (at least insofar as ERISA is concerned)" because §510 specifically provides that an employer may not "'discharge . . . a [plan] participant or beneficiary for the purpose of interfering with the *attainment of any right* to which such participant may be entitled under [an ERISA plan].'" Id. at 514 (emphasis in the original). In Firestone, the Supreme Court held that the term "plan participant" must be read "to mean either 'employees in, or reasonably expected to be in, currently covered employment,' . . . or former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." Id. at 117. Inter-Modal and Firestone establish that plaintiff has stated a cognizable claim under §510 because, as he alleges, the LTD Plan was impermissibly terminated [see Sections B, C and D *supra*]; because he is (and was prior to his termination) seeking, on valid grounds, reinstatement of the plan [see Sections B.1., D];[13] and because, as he alleges, he was terminated to prevent him from obtaining coverage under the plan [see Amended Complaint, Fourth Claim for Relief at ¶40]. See Inter-Modal at 514 (termination to prevent employee from obtaining any benefit to which he may become entitled under a welfare benefit plan is unlawful

---

[13] Plaintiff's claim for wrongful termination under §510 of ERISA should proceed even if it is determined that his other claims under ERISA are not viable. See, e.g., Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1321 (S.D.N.Y. 1993) (granting plaintiff summary judgment for statutory penalties where his employer had not responded to his request for a Summary Plan Description, court noted that "the class of 'potential participants,' those who have 'colorable claims' to benefits, clearly encompasses a larger group than just those individuals ultimately determined to have rights under a plan. A court may properly award statutory penalties under §502(c) [§1132(c)] even if it determines that the plaintiff does not qualify for plan benefits").

under § 510).[14]

### F.    FIFTH CLAIM FOR RELIEF – FAILURE TO PAY SEVERANCE BENEFITS

In his Fifth Claim for Relief, plaintiff asserts a claim for severance benefits under 29 U.S.C. §1132(a)(1)(B) based on the fact that "[d]efendants . . . failed to pay plaintiff the severance benefits he was due under the Severance Plan upon the termination of his employment." Amended Complaint, Fifth Claim for Relief at ¶64.

The Amended Complaint alleges that the Severance Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(3) [see id. at ¶11], that defendants paid severance in accordance with the Severance Plan to all terminated management employees, including those who were terminated for cause, in an amount equal to at least one week of salary for every year of service [see id. at ¶¶48, 60], that defendants terminated plaintiff's employment at the end of September 2002 [see id. at ¶¶54, 58], and that plaintiff was a management employee but that defendants failed to pay plaintiff any severance when his employment was terminated [see id. at ¶¶19, 22, 24, 60].

In seeking dismissal of this claim, defendants grossly mischaracterize the allegations plaintiff makes in support of his claim for severance benefits. Defendants assert that plaintiff merely alleges that he was offered severance benefits and turned them down because he felt them unfair. Defendants do not describe plaintiff's allegations accurately. In fact, plaintiff alleges that Peter Baker, defendants' President, tried unsuccessfully in the fall of 2001 to convince plaintiff to retire by telling him that he could "make his dreams come true," that plaintiff informed Baker

---

[14] Defendants do not argue that plaintiff has not alleged or does not have a reasonable basis for asserting that he may become entitled to benefits under the LTD Plan, but rather argue that he has not alleged that he *was* disabled at any time. Defendants do not allude to the fact that plaintiff has alleged that he has been diagnosed with a disabling disease. See Amended Complaint at ¶30.

that he had no intention of retiring at that time, and that when plaintiff went to Baker several months later in early 2002 to ask him what he had in mind because his working conditions were becoming increasingly difficult, Baker offered him the standard severance and help with obtaining medical insurance coverage. See id. at ¶¶38-39, 41, 47-48. Plaintiff informed Baker that this offer was unfair because he did not want to retire at that time. See id. at ¶50. Several months later, at the end of September 2002, defendants terminated plaintiff's employment. See id. at ¶58. Defendants did not thereafter pay or offer to pay plaintiff the severance benefits he was due under the Severance Plan. See id. at ¶60.

Contrary to the implication of defendants' characterization of plaintiff's allegations, plaintiff does not allege that he turned down an offer from defendants of benefits under the Severance Plan when he was terminated. Rather plaintiff, as he alleges, refused to voluntarily leave his employment on the basis of the offered severance and then defendants later involuntarily terminated his employment but failed to pay him the severance benefits due under the Severance Plan.

Contrary to defendants' argument, plaintiff has alleged a valid claim for failure to pay severance benefits under defendants' Severance Plan pursuant to ERISA, 29 U.S.C. §1132(a)(1)(B). See Schonholz v. Long Island Jewish Medical Center, 858 F.Supp. 350, (E.D.N.Y. 1994) ("Plaintiff alleges that she has not been paid benefits according to a severance pay program in effect at the time her employment terminated; these allegations are sufficient to state a claim under ERISA and therefore to withstand a motion to dismiss.").

### G.    SIXTH CLAIM FOR RELIEF – FAILURE TO PROVIDE DOCUMENTS

In the Sixth Claim for Relief, plaintiff seeks relief pursuant to 29 U.S.C. §1132(c)(1) for defendants' refusal to provide plaintiff with requested documents concerning the LTD Plan in violation of 29 U.S.C. §§1022, 1024 and 1132. Under §1132(c)(1), the court may impose a

32

penalty in an amount up to $100 a day from the date a plan administrator refuses to provide

information that a plan participant has requested and is entitled to receive under ERISA.  See 29

U.S.C. §1132(c)(1).

As alleged in the Amended Complaint, plaintiff wrote, through his attorney, on

September 6, 2002, shortly before defendants terminated his employment, to request "'that he be

provided with 'a copy of every summary plan description and notice issued concerning any

modification and/or termination of the [LTD] coverage provided by Crystal Rock Water Co. to

its employees commencing in or about 1985." Amended Complaint at ¶53; Ex. 3.  Plaintiff

sought documents – summary plan descriptions and modifications and/or changes in the plan –

that defendants are required to provide to plan participants, including plaintiff, pursuant to

ERISA, 29 U.S.C. §§1022, 1024 and 1132.  Defendants explicitly refused in their September 19,

2002 letter terminating plaintiff's employment to provide the requested documents, stating

"Vermont Pure will not respond to your September 6, 2002 request" and giving as their reason

the insupportable claim that plaintiff was a "'fiduciary' as that term is defined by ERISA"and,

therefore, not entitled to such documents. Ex. 4.[15]

ERISA, 29 U.S.C. §1132(c)(1), provides, in pertinent part, that:

> Any administrator . . . who fails or refuses to comply with a request for any information
> which such administrator is required by [ERISA] to furnish to a participant or beneficiary
> . . . by mailing the material requested to the . . . requesting participant or beneficiary

---

[15] Defendants' rationale for refusing to provide the documents to plaintiff was baseless.
Plaintiff was clearly not a fiduciary of the LTD Plan.  ERISA defines "fiduciary" in 29 U.S.C.
§1002(21) as a person who with respect to the ERISA plan in question "exercises any
discretionary authority or discretionary control respecting management of such plan or exercises
any authority or control respecting management or disposition of its assets, . . . renders
investment advice [with respect to plan assets] . . . , or has any discretionary authority or
discretionary responsibility in the administration of such plan."

33

within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

As the Supreme Court held in <u>Firestone Tire and Rubber Company v. Bruch</u>, 489 U.S. 101, 117

(1989), §1132(c)(1) permits suit by a plan participant, like plaintiff herein, who is a former

employee of the plan in question and not currently receiving benefits under the plan.  The Court

defined the term plan "participant" to include:

> "employees in, or reasonably expected to be in, currently covered employment," . . . or former employees who "have . . . a reasonable expectation of returning to covered employment" or who have "a colorable claim" to vested benefits. . . . In order to establish that he or she "may become eligible" for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future.

<u>Id.</u> at 117-118.

Plaintiff meets the <u>Firestone</u> definition of plan participant in that he is a former employee

who has a reasonable expectation of returning to covered employment and in that he has a

colorable claim to vested benefits.  As set forth above, plaintiff has a colorable claim that the

LTD Plan was impermissibly terminated in violation of ERISA and must be reinstated.  <u>See</u>

Sections B, C and D *supra*.  Plaintiff likewise has, as set forth above, a colorable claim that he

must be  reinstated to his employment and to coverage under the plan.  <u>See</u> Sections B.1., D

*supra*.[16]  In these circumstances, plaintiff has stated a cognizable claim for statutory penalties

under ERISA, 29 U.S.C. §1132(c)(1).  <u>See</u> <u>Kascewicz v. Citibank, N.A.</u>, 837 F. Supp. 1312,

1321 (S.D.N.Y. 1993) (granting plaintiff summary judgment for statutory penalties where his

---

[16]  As discussed *supra*, plaintiff has a valid claim for reinstatement of the LTD Plan and his coverage under it.  Plaintiff claims reinstatement both as a member of the group LTD Plan, as set forth above, and as an individual insured, if he was permitted to convert to individual coverage under the Plan.  <u>See</u> Section B *supra* including n.7.

34

employer had not responded to his request for a summary plan description, court noted that "the class of 'potential participants,' those who have 'colorable claims' to benefits, clearly encompasses a larger group than just those individuals ultimately determined to have rights under a plan. A court may properly award statutory penalties under §502(c) [§1132(c)] even if it determines that the plaintiff does not qualify for plan benefits").

Defendants argue that plaintiff's claim for statutory penalties under 29 U.S.C. §1132(c) must be dismissed on the basis that plaintiff purportedly lacks standing because he is not a "plan participant" within the meaning of 29 U.S.C. §1132(c), as defined by the Supreme Court in Firestone, 489 U.S. at 117. Plaintiff lacks standing or is not a "plan participant," defendants argue, because when plaintiff commenced this action, he was not employed by defendants, he had no reasonable expectation of returning to covered employment, and he had no colorable claim for benefits because the LTD Plan had been terminated several years before. As set forth above and in Section E *supra*, defendants' claim that plaintiff is not a "plan participant" is incorrect and, since "plan participants" have standing to bring a Section 1132(c) claim, defendants' argument that plaintiff lacks standing to seek ERISA penalties must fail.

The cases upon which defendants rely in support of their argument to dismiss plaintiff's claim for ERISA penalties are, furthermore, inapposite. In Winchester v. Pension Committee of Michael Reese Health Plan, Incorporated Pension Plan, 942 F.2d 1190 (7th Cir. 1991), the court held that an employee lacked standing to sue for penalties under §1132(c) because she was not a "plan participant" under circumstances in which, *inter alia*: 1) the employee had been dismissed for cause on February 18, 1986 and requested plan documents on April 22, 1986; 2) the employer responded on May 1, 1986; 3) the employee sent a second request on May 12, 1986; 4) the

35

employer notified the employee on May 19, 1986 that authorization had been received to release

the employee's pension funds to her and that she was invited to review the SPD when she picked

up her pension funds; 5) the employee sent another request on June 5, 1986 for all documents

regarding pension policies, etc. and stating that she intended to institute legal action if she did not

receive all such information within five days; 6) the employer responded on June 9, 1986 by

sending the employee a copy of the pension SPD; 7) the employee made another request for

information on June 15, 1986 stating that she had only received a summary; 8) the employer

responded on July 7, 1986 that the SPD that had been provided to her was the only information

that was available to employees and that it included all of the information she requested; and 9)

on July 18, 1986 the employee accepted her pension funds in a lump sum payment from the

pension plan. See Winchester at 1191-92. Two years later, on September 1, 1988, the employee

submitted another request for information, and the employer responded that the employee had

already received the information she requested and had already received the pension funds due

her. See id. at 1192. On April 24, 1989, the employee commenced suit seeking $100 a day from

May 22, 1986 until she was provided with all information she had requested. See id. On May 2,

1989, the employer sent the employee a copy of the plan. See id.

On a motion for summary judgment, the court held that, under these circumstances,

plaintiff did not have standing as a plan participant when she brought the lawsuit inasmuch as she

had already accepted the pension benefits due her, was not contesting the amount of the benefits

received and, therefore, did not have a colorable claim to vested benefits. See id. at 1193. The

court also found that she did not have standing as a plan participant because she had no

reasonable expectation in March 1989 of returning to covered employment, even though she had

filed a discrimination lawsuit, since she had been terminated for cause and had been paid and accepted all benefits she was due under the plan in question. See id.

Defendants' reliance on Winchester is misplaced. There is little or no similarity between the facts in Winchester and the facts in this case. Defendants attempt to create a similarity that does not exist by stating that plaintiff herein, like Ms. Winchester, was terminated for cause. This claim is not supported by the allegations of plaintiff's Amended Complaint and is, in fact, contested. See footnote 6 *supra*; Amended Complaint generally.

The other cases defendants cite are likewise inapposite. In Kamler v. H/N Telecommunication Services, Inc., 305 F.3d 672 (7th Cir. 2002), the court merely held that the district court had not abused its discretion in denying plaintiff's motion for statutory penalties because plaintiff did not request the documents from the plan administrators, as required by §1132(c), the requested documents were outdated since the plan had been rightfully terminated and the request was made a year and a half after the medical expenses at issue had been incurred. See Kamler at 683. In Sampson v. Rubin, 2002 WL 31432701 (D. Mass. 2002), the court found on a motion for summary judgment that the plaintiff was not a plan participant when he requested the LTD plan documents in December 1999 because he was neither an employee, nor covered by the plan that had been canceled in 1995. See Sampson at *10. The court found further that plaintiff had no "colorable claim" to vested benefits because he was seeking damages for failure to give notice of the plan termination, not alleging a wrongful denial of benefits. See id. Finally, the court exercised its discretion to decline an award of penalties – even if plaintiff were construed to be a plan participant – because plaintiff had already received in 1994 the materials he requested in 1999. See id. Unlike the plaintiff in Sampson, plaintiff herein is a plan

37

participant because, as set forth above, he is making a colorable claim for reinstatement of the terminated LTD Plan and his coverage under it, as well as for reinstatement of his employment. Further, plaintiff has never been provided with the LTD Plan documents he requested.

Defendants' argument that plaintiff lacks standing to seek statutory damages is, in sum, without merit inasmuch as plaintiff is a plan participant because he has a colorable claim to reinstatement as an employee and coverage under the LTD Plan.

## IV.    CONCLUSION

For all the foregoing reasons, defendants' Motion to Dismiss must be denied.

THE PLAINTIFF, BRIAN CLARK

By: _____
KATHRYN EMMETT
Federal Bar No. CT05605
CHRISTINE CAULFIELD
Federal Bar No. ct19115
EMMETT & GLANDER
45 Franklin Street
Stamford, CT 06901
(203) 324-7744

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, this 2nd day of January, 2004, to:

Daniel Green, Esq.
Robert Ray Perry, Esq.
Jackson Lewis LLP
177 Broad Street, 8th Floor, P.O. Box 251
Stamford, CT 06904-0251

Kathryn Emmett

39

# ON THE ROCKS

Vol. 2  No.4   Crystal Rock Water Co.   April 1985

## A Letter From The Editor
## A Major New Plan

I've been asked to use the newsletter to announce a new company benefit to the employees of Crystal Rock. This new benefit is of such potential significance to us all, that I feel compelled to present the plan in an editorial, rather than in news item form.

It is impossible for me to remain objective: I feel so strongly about this plan.

In my twelve years at Crystal Rock, if I realized only one thing, it is that Henry has always sought to provide all of us with the most complete and all encompassing protection against life's unforeseen ills.

We've been provided with insurance coverage against the costs of minor and catastrophic medical expenses; coverage for dental care; provisions for our families in the form of a generous life insurance policy, and security in our later years with profit sharing and retirement income. These are all in addition to regulatory requirements, such as workman's compensation and social security.

We are a young company, speaking with regard to the age of the employees, and it is not often first and foremost in our minds to think about these important benefits. But Henry thinks about it.... and about the total well being of Crystal Rock's employees.

And it occured to him that we lacked one form of protection against catastrophe.

In the event that one of us should suffer some disabling illness or off the job injury that would force an extended leave of absense from work, our major medical plan would provide us with income of 70% of our weekly wages up to a maximum of $250 per week. This plan begins paying at day 15 of the absense, and continues for 52 weeks.

A new income maintenance policy has been written for the employees at Crystal Rock. It begins at the 180th day of the absence and continues for the length of the absence or until age 65.

It pays 60% of the employee's weekly wage to a maximum of $5,000 per month.

In the event of an illness or injury resulting in permanent disability, the victim would receive the support payments in conjunction with social security, state disability, or early retirement pension benefits, totaling 70% of income at the time he or she stopped working.

JL 0352

# ON THE ROCKS

## Editorial (cont.)

Another aspect of the plan states that if the disabled person should make a partial recovery but not enough for him or her to return to the previous job and rate of pay, then insurance payouts would be combined with income from any employment that could be obtained in order to bring total income to 70% of previous earnings.

WHAT'S ALL THIS MEAN? Quite simply, if you should suffer from an illness or off the job injury that should ultimately prevent you from returning to your job... the "standard of living" which you now enjoy, does not have to change. Important? Think about it for a long minute!

Under our previous plan, you would receive a maximum of $250 per week for up to one year. At the end of that year, if you were still unable to return to work, you would have to rely on social security or state aid, both of which are substantially less than what most of us make per week.

The new plan leaves the original plan in effect for 6 months but then takes over to maintain the approximate income that you previously enjoyed.

This new benefit may not seem important to you now as you enjoy good health; and pray that you never have to take advantage of the plan, but (as life insurance salesmen like to say) "God Forbid" a catastrophe should occur in your life... it is comforting to know that you will still be able to keep up the payments on the car, or house, or condo...

Special information on the plan is available from David Baker.





## American Red Cross

WE DID IT BEFORE
WE CAN DO IT AGAIN

Our company has been invited once again, to sponsor a blood drive at the American Red Cross Community Donor Center, at 111 High Ridge Road, the week of May 6th, 1985.

Employees wishing to donate blood may do so during working hours by making an appointment through their supervisors.

The Donor Center is open Tuesday through Saturday, and collects blood during the following hours:

| | |
|---|---|
| Tuesday | 9 am - 4 pm |
| Wednesday | 11 am - 6 pm |
| Thursday | 1 pm - 8 pm |
| Friday | 9 am - 4 pm |
| Saturday | 9 am - 4 pm |

GIVE A GIFT OF LIFE
GIVE BLOOD

## Drew's Law Of Professional Practice

The client who pays the least complains the most.

JL 0353

# EMMETT & GLANDER

ATTORNEYS AT LAW

45 FRANKLIN STREET
STAMFORD, CONNECTICUT 06901
TELEPHONE (203) 324-7744
FACSIMILE (203) 969-1319

KATHRYN EMMETT
JANE W. GLANDER
CHRISTINE CAULFIELD*

* ALSO ADMITTED IN NEW YORK

NEWTOWN OFFICE
17 POND BROOK ROAD
P. O. BOX 724
NEWTOWN, CONNECTICUT 06470
TELEPHONE (203) 270-9272
FACSIMILE (203) 426-1270

August 2, 2002

Peter Baker, President
Crystal Rock Water Company
1050 Buckingham Street
Watertown, CT 06795

Dear Mr. Baker:

I am writing to you on behalf of Brian Clark, who has retained me to represent him in connection with issues that have arisen concerning the status of his employment at Crystal Rock Water Company. I understand from Mr. Clark that within the past year you suggested to him that he might wish to terminate his employment at Crystal Rock and offered him a severance proposal that is unacceptable to him. The intent of this letter is to explain Mr. Clark's position so that the issues that presently concern both Mr. Clark and Crystal Rock can be identified and addressed.

In order to put the current situation in context, a history of Mr. Clark's employment at Crystal Rock is necessary. Mr. Clark began working as a Route Salesman at Crystal Rock on August 3, 1973. He became a Supervisor in 1979 and Director of Route Sales in 1985. In 1992, Mr. Clark was promoted to Sales Manager reporting to the Vice President. Mr. Clark's performance as an employee has been exemplary. In fact, he was chosen as the first to receive the company's Employee of the Year award.

In December 1999, Mr. Clark was diagnosed with Parkinson's disease. Shortly thereafter, Mr. Clark began to encounter adversity in his employment relationship with Crystal Rock. First, when the sales department was reorganized, Mr. Clark, who had been the Sales Manager since 1992 was not promoted or assigned to a comparable position in sales, but rather was offered the position of Human Resources Manager and advised by Michael Dunn, the departing HR Manager, that he should accept the position because his job as Sales Manager would soon be eliminated. Even though he had no background in human resources, Mr. Clark accepted the position having been advised that he would likely be out of a job if he did not do so.

Throughout his years in management at Crystal Rock, Mr. Clark had been advised by management that when an employee was no longer wanted at the company, the employee should not be terminated but rather should be subjected to working conditions that were so difficult or

EMMETT & GLANDER

Peter Baker, President
August 2, 2002
Page Two of Three

intolerable that the employee would choose to leave. Soon after Mr. Clark took over as HR Manager in July 2000, he began to experience such difficulties. In October 2000, Crystal Rock merged with Vermont Pure. As a result of the merger, Mr. Clark's job responsibilities as HR Manager increased dramatically -- the number of employees nearly doubled from 160 to 300 and major changes in benefits were made. Despite the fact that the merger more than doubled the HR function, Mr. Clark was not given additional staff or other assistance. Mr. Clark repeatedly requested additional staff and suggested specific restructuring to alleviate the burden on him, but none of the requested changes or accommodations was made and, as a result, Mr. Clark's ability to perform his job has been stretched to the limit and he has been forced to work nights and weekends. His work burden has been so severe that he has even enlisted his wife to assist him with his responsibilities after hours.

Despite the unreasonable work burden imposed on him, Mr. Clark continued to function as a dedicated employee. After Mr. Clark gave no indication that he would leave voluntarily despite the enormous work pressure that had been imposed on him, you told him in November 2001 that "maybe you could make his dreams come true" or words to that effect. Mr. Clark, who was then 49 years old, informed you that he had no intention of retiring or terminating his employment with Crystal Rock at that time. He had been employed with the company for 28 years and fully intended to continue working at Crystal Rock for as long as his health permitted, which he expected to be at least until 2010. Just before or soon after you suggested to Mr. Clark that he retire from Crystal Rock, he was subjected to a number of additional adverse job actions. For example, despite the fact that he had received an $8,000 bonus each year for the past several years, Mr. Clark received a $4,000 bonus in 2001 while other key managers received bonuses equal to or greater than the bonuses they had received in previous years. Likewise, David Jurasek, the Controller, screamed at Mr. Clark in a highly offensive and inappropriate manner concerning the fact that he had not paid a $3,000 telephone bill that was in dispute by the end of the fiscal year.

In January 2002, Mr. Clark became unable to continue ignoring the adverse treatment he was receiving from upper management and informed you that he had "had it" or words to that effect and stated that he was willing to leave because you did not want him there anymore but that he needed to know what you were offering when you said you "could make his dreams come true" so that he could make his decision. In February, you and Mr. Jurasek informed Mr. Clark that you had structured a severance package for him. You offered to pay him one week of salary for each of the 29-30 years of his employment. Mr. Clark informed you that this offer was unacceptable. At that time, you made a vague reference to COBRA benefits. Since that time, no further discussions have occurred.

ʹEMMETT & GLANDER

Peter Baker, President
August 2, 2002
Page Three of Three

Mr. Clark rejected the offer you made based on economic necessity. Even though his working conditions are currently extremely difficult both because of upper management's negativity toward him and because of the size of his work load and the lack of assistance he is provided, Mr. Clark does not want to leave Crystal Rock and certainly cannot agree to leave based on the severance offer you have made. It is apparent the Mr. Clark's status at Crystal Rock plummeted after his Parkinson's diagnosis and that, because he is an older employee, the company has been pushing him to retire. Any adverse job actions that have been or may be taken against him in these circumstances represent disability and/or age discrimination, illegal deprivation of employee benefits and constitute violations of his rights under the Americans with Disabilities Act, ERISA and the Age Discrimination in Employment Act, as well as the Connecticut Fair Employment Practices Act. The severance package you have proposed does not account for the fact the Mr. Clark's expression of an interest in leaving was caused by Crystal Rock's wrongful and discriminatory conduct toward him or for the fact that the economic consequences to him of leaving are enormous.

The premature termination of Mr. Clark's employment at Crystal Rock, assuming that he would continue to be able to work until at least 2010, would result in at least the following losses to him: $850,000 in base salary; $64,000 in bonuses; $16,000 in sick pay; $49,000 in vacation pay; $68,000 for medical insurance coverage; $13,000 in employer contributions to his 401(k); $77,000 in private disability insurance payments; and the value of unvested stock options and future option grants. In addition, Mr. Clark has already lost approximately $134,400 because Crystal Rock canceled, without his knowledge and in violation of ERISA, the long term disability coverage that it had previously provided for its employees.

As the above summary indicates, Mr. Clark is facing serious and substantial issues concerning his continued employment at Crystal Rock. I would appreciate the opportunity of speaking with you or your representative concerning these matters. I will be in the office on August 9 or on or after August 19, 2002. In my absence, you may speak with Attorney Christine Caulfield in my office. Thank you very much for your consideration.

Very truly yours,

Kathryn Emmett

KE/ns
cc:    Mr. Brian Clark

# EMMETT & GLANDER
### ATTORNEYS AT LAW

45 FRANKLIN STREET
STAMFORD, CONNECTICUT 06901
TELEPHONE (203) 324-7744
FACSIMILE (203) 969-1319

KATHRYN EMMETT
JANE W. GLANDER
CHRISTINE CAULFIELD*

NEWTOWN OFFICE
17 POND BROOK ROAD
P. O. BOX 724
NEWTOWN, CONNECTICUT 06470
TELEPHONE (203) 270-9272
FACSIMILE (203) 426-1270

* ALSO ADMITTED IN NEW YORK

September 6, 2002

**Via Facsimile (215) 665-7210**
Melanie Miller, Esq.

      **Re:**    **Brian Clark**

Dear Attorney Miller:

      I am sending this letter to you rather than to Crystal Rock's offices inasmuch as you have been communicating with me on behalf of Crystal Rock Water Company concerning my client Brian Clark.

      I am writing to request, pursuant to ERISA, 29 USC § 1001 *et seq.*, that you provide Mr. Clark c/o this office with a copy of every summary plan description and notice issued concerning any modification and/or termination of the Long Term Disability coverage provided by Crystal Rock Water Co. to its employees commencing in or about 1985.

      Thank you for your attention to this request.

              Very truly yours,

              Kathryn Emmett

KE/dmc



PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
LAS VEGAS
LONDON
LOS ANGELES

**COZEN**
**O'CONNOR**
ATTORNEYS

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
WASHINGTON, DC
WEST CONSHOHOCKEN
WILMINGTON

A PROFESSIONAL CORPORATION

1900 MARKET STREET    PHILADELPHIA, PA 19103-3508    215.665.2000    800.523.2900    215.665.2013 FAX    www.cozen.com

September 19, 2002

Melanie A. Miller
Direct Phone 215.665.2714
Direct Fax   215.701.2414
mmiller@cozen.com

*By Facsimile and Regular Mail*

Kathryn Emmett, Esquire
**Emmett & Glander**
45 Franklin Street
Stamford, CT 06901

Re:    <u>Termination of Brian Clark</u>

Dear Ms. Emmett:

By way of your August 2, 2002 letter to Peter Baker, Brian Clark, without any prior notice to Vermont Pure Holdings, Ltd. ("Vermont Pure") has demanded over $1 million to sever his employment with the company. Mr. Clark's stated justification for this outrageous amount is the "adversity", "discrimination" and "deprivation" he has allegedly encountered during his 30-year career with Crystal Rock Bottled Water ("Crystal Rock") and Vermont Pure.

Vermont Pure has conducted a comprehensive investigation into Mr. Clark's claims and correspondingly determined that they are utterly without merit. Moreover, it has become apparent to Vermont Pure that Brian Clark has falsely represented material facts in an effort to extort remuneration from Vermont Pure to which he is not entitled.

By his own admission, Mr. Clark was diagnosed with Parkinson's disease in December of 1999. Immediately thereafter, at his request, Mr. Clark was promoted to Human Resources Manager. Because Mr. Clark possessed neither an undergraduate degree nor the requisite work experience, in the spring of 2000, the previous Human Resources Manager, Michael Dunn, was hired as a consultant to train Mr. Clark and effectuate Mr. Clark's transition from Sales Manager to Human Resources Manager.

At the same time, Vermont Pure and Crystal Rock were in the process of negotiating an agreement to merge the two companies. The merger agreement was signed in May of 2000 and closed in October of 2000. Contrary to Mr. Clark's assertion, the "sales department" was never

JL  0098

Kathryn Emmett, Esquire
September 19, 2002
Page 2

---

"reorganized." Nor was Mr. Clark's previous position as Sales Manager "eliminated." Even accepting the representation that Mr. Dunn "advised" Mr. Clark that "he would be out of a job" if he did not accept his current position, Mr. Clark has significantly failed to explain why he never previously complained about Mr. Dunn's adverse treatment. This failure to notify company management is particularly damaging given that Mr. Clark assumed Mr. Dunn's position within the company. Moreover, although he now claims that he has suffered extreme discrimination, Mr. Clark never requested a transfer to a different position or a reduction of his current job responsibilities.

Crystal Rock's payroll records indicate that Mr. Clark took over his current position as Human Resources Manager in June of 2000. As the current Human Resources Manager, Mr. Clark is responsible for administering the new Vermont Pure's benefit plans. He administers employee vehicle and property damage claims; responds to employee inquires regarding the benefit plans; notifies employees of the benefit plans; acts as an intermediary between employees and third-party administrators; maintains payroll and other personnel records; and participates in the hiring and termination of employees. In this position, Mr. Clark is the primary liaison between Vermont Pure's management and its employees.

Mr. Clark cannot provide any documentation reflecting the alleged "requests" for additional "staff" to alleviate his workload or which delineate the "restructuring" he allegedly proposed. Nor did Mr. Clark advise Vermont Pure that his wife was assisting him with his job responsibilities. Moreover, during his 30-year career with Crystal Rock and Vermont Pure, Mr. Clark had previously requested, and received, compensation for services his wife had provided to the company. These factual predicates render Mr. Clark's belated claim of burden insincere, at best.

Mr. Clark's 2001 bonus reflected his job performance for that year. Nor should his 2000 bonus be used as a comparison. In 2000, the original Crystal Rock employees, including Mr. Clark, received increased bonuses as an incentive to stay with Vermont Pure. Moreover, as a result of the merger, Mr. Clark, along with several other key employees, entered into an agreement with Vermont Pure that granted him 25,000 options vesting over a four-year period.

Vermont Pure does not have a severance program. Around January of this year, various management personnel were advised that Mr. Clark intended to resign his employment in December of 2002 to open up a restaurant in Florida. To that end, several informal discussions were commenced. These discussions were ongoing and no severance offer was made by Vermont Pure.

Mr. Clark additionally maintains that Crystal Rock "cancelled, without his knowledge and in violation of ERISA, the long term disability coverage that it had previously provided for its employees." As a result of the merger of the two companies, Crystal Rock's long term disability policy was terminated on August 8, 2000. By counsel's admission, during the training for his current position, Mr. Dunn advised Mr. Clark that Crystal Rock no longer offered long term disability coverage. As such, Mr. Clark had actual knowledge of the termination of

JL  0099

Kathryn Emmett, Esquire
September 19, 2002
Page 3

coverage by June of 2000. Moreover, Mr. Clark is a "fiduciary" as that term is defined by ERISA. As such, Vermont Pure will not respond to your September 6, 2002 request for "a copy of every summary plan description and notice issued concerning any modification and/or termination of the Long Term Disability coverage provided by Crystal Rock Water Co. to its employees commencing in or about 1985." Employee notice is irrelevant given Mr. Clark's actual knowledge and fiduciary status.

Despite repeated requests, Mr. Clark has failed to document, in any manner, his claim of adverse treatment. Nor can Mr. Clark identify any notice, other than your August 2, 2002 letter, that he provided to either Crystal Rock or Vermont Pure regarding their alleged misconduct toward him.

Vermont Pure has therefore concluded that Mr. Clark has falsely claimed discrimination in an effort to coerce increased compensation and/or severance benefits. Such dishonesty is contrary to Vermont Pure's standard of conduct and will not be condoned. Please therefore advise Mr. Clark that Vermont Pure has terminated him, with cause, effective September 30, 2002.

Very truly yours,

COZEN O'CONNOR

BY:    MELANIE A. MILLER

cc:    (by hand delivery)
       Timothy Fallon
       Peter Baker
       Brian Clark

JL  0100

Kathryn Emmett, Esquire
September 19, 2002
Page 4

bcc:    Kevin F. Berry

JL  0101