UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN CLARK,<br><br>                Plaintiff,<br><br>-against-<br><br>VERMONT PURE HOLDINGS, LTD., CRYSTAL ROCK SPRING WATER COMPANY, CRYSTAL ROCK LONG TERM DISABILITY PLAN, and CRYSTAL ROCK SEVERANCE PLAN,<br><br>                Defendants. | Civ. No: 3:02CV2278 (MRK)<br><br><br><br><br><br><br><br>February 16, 2005 |

### DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

Defendants, in accordance with the provisions of L. Civ. R. 56(a)1, respectfully submit the following statement of material facts as to which the defendants submit there is no genuine issue to be tried.[1]

### PARTIES

1.    Plaintiff, Brian Clark ("Clark") is over 40 years of age. (Compl., ¶ 13.)

2.    In May 2000, Defendant Crystal Rock Spring Water Company ("Crystal Rock") announced that it would be merging with Vermont Pure Holdings, LTD ("Vermont Pure"). (Compl., ¶ 21.)

---

[1] The facts set forth below are based upon certain undisputed allegations of the plaintiff Brian Clark's third amended complaint ("Compl., ¶ ___." ), Clark's deposition testimony ("Clark Dep. at ___."), exhibits at Clark's deposition ("Clark Dep. Ex. ___."), the deposition testimony of Peter Baker ("Baker Dep. at ___." ), Dave Jurasek ("Jurasek Dep. at ___.") and Michael Dunn ("Dunn Dep. at ___."), and the affidavits of Baker ("Baker aff., ¶ ___."), Jurasek (Jurasek aff., ¶ ___.) and Timothy Loftus of UnumProvident Corporation ("Loftus aff., ¶ ___.").

3.  Effective October 2000, 100% of the stock of both Crystal Rock and Vermont Pure was acquired by VP Merger Parent, Inc., which was later renamed Vermont Pure Holdings, LTD. (Compl., ¶ 32; Jurasek aff., ¶ 5.)

4.  Crystal Rock is in the business of manufacturing and selling water, water coolers and coffee service supplies. (Baker aff., ¶ 4.)

5.  Defendant Crystal Rock Long Term Disability Plan ("LTD Plan") was an employee benefit plan within the meaning of 29 U.S.C. § 1002(3). (Compl., ¶ 10.)

### CLARK'S EMPLOYMENT

6.  On August 3, 1973 Clark became a full time employee of Crystal Rock. (Compl., ¶ 14.)

7.  Before 1992, Clark held various positions at Crystal Rock, including route salesman, route supervisor and director of route sales. (Clark Dep. at 13, 14, 17.) In 1992, Clark became Crystal Rock's sales manager. (Clark Dep. at 21.) Effective July 1, 2000, Clark became Crystal Rock's manager of human resources. (Compl., ¶ 23.)

8.  Clark was aware of the Crystal Rock-Vermont Pure merger when he accepted the manager of human resources position. (Clark Dep. at 106.)

9.  When Clark became Crystal Rock's sales manager in 1992, he reported to Peter Baker ("Baker") and Gene Monte. (Clark Dep. at 22.) Within 12-18 months of taking over as sales manager, Clark felt that Gene Monte did not provide him with sufficient support. (Clark Dep. at 31-32.)

10. In 1994, John Woermer ("Woermer") was hired to manage Crystal Rock's retail sales of bottled water. (Clark Dep. at 38-40.)

11. In October 1999, Baker, who was then president of Crystal Rock, made a favorable comment to Clark about his performance as sales manager during a convention that they attended in New Orleans. At that point, Clark had felt uncomfortable about his position at Crystal Rock for 12-14 months. Baker's comment was the first positive comment that Clark had heard during this period. (Clark Dep. at 80-85.)

12. Clark felt defensive because he felt that Baker and Woermer developed a close relationship and that "[Woermer] had [Baker's] ear." (Clark Dep. at 40.) By February 2000, Clark was concerned that the Baker's close relationship with Woermer could have a negative affect on Clark's career as sales manager. (Clark Dep. at 57-60.)

13. When Clark became Crystal Rock's manager of human resources, he had no background in the human resources field. (Compl., ¶ 23.)

14. When Clark transferred to the human resources position, Woermer replaced Clark as Crystal Rock's sales manager. Woermer's performance as sales manager was unsatisfactory, and his employment was terminated, effective November 19, 2001. (Baker aff., ¶ 9; Clark Dep. at 55.)

15. Prior to December 1999, Clark experienced noticeable tremors, which he attributed to stress on the job. (Clark Dep. at 212-213.)

16. In December 1999, Clark was diagnosed with Parkinson's disease. When Clark told Baker about his diagnosis, Baker was very supportive. (Compl., ¶ 18.; Clark Dep. at 213.)

17. In June 2000, Clark spoke to Baker about becoming manager of human resources. Baker was reluctant to offer Clark the position, but Clark gave Baker assurances that the departing human resources manager, Mike Dunn ("Dunn"), felt that Clark could handle the new position. Clark also told Baker that Clark felt it was in Clark's best interests to take the human resources job. (Clark Dep. at 96-97.)

18. Following the Crystal Rock-Vermont Pure merger, as manager of human resources, Clark had the responsibility to integrate 130 new employees into Crystal Rock's human resources functions. (Clark Dep. at 149.) Clark asked for assistance and received some. (Clark Dep. at 152-153.) He assumes he did not receive additional help because the company's resources were stretched following the merger. (Clark Dep. at 154.)

19. Clark had felt he always had "a lot on his plate" for the 20 years prior to his becoming manager of human resources. He felt that the sales manager position, which he held from 1992 until June 2000 was a stressful job. (Clark Dep. at 217, 277.)

20. Following the merger, Clark was aware that everyone at Crystal Rock was busy. He was aware that the customer services department was overburdened. To the degree that management was not responsive to the requests Clark made for additional assistance, Clark assumed it was because many people were overburdened due to the transition. (Clark Dep. at 139-140, 156.)

21. During the period in which Clark served as Crystal Rock's sales manager he felt he did not get the support he would have liked from David Jurasek ("Jurasek"), Crystal Rock's controller. (Clark Dep. at 140-142.)

22. In the fall of 2001, Jurasek had requested that all Crystal Rock bills be submitted for payment by October 31, 2001. Clark failed to submit a SNET bill by the deadline. When Clark subsequently acknowledged his mistake, Jurasek yelled at Clark in a manner that other employees could hear. Baker intervened, and Jurasek calmed down. The next day, Jurasek apologized for yelling at Clark, and Clark accepted the apology. (Clark Dep. at 218-221, 224, 225.)

23. On another occasion, on a Saturday, Jurasek yelled at Clark over the expense involved in cleaning a number of employees' chairs. (Clark Dep. at 221-224.) Clark concedes that Baker would not have wanted Jurasek to yell at him. (Clark Dep at 227.)

24. Baker and Clark occasionally had heated discussions in which they both raised their voices. (Baker Dep. at 126.)

25. On October 3, 2000 Clark received his 2000 bonus from Crystal Rock, which was in the amount of $8,000. On November 9, 2000 Clark was paid an additional $8,000 bonus for 2000, in recognition of the Vermont Pure merger. The $16,000 combined bonus was the largest Clark ever received during his employment at Crystal Rock. (Baker aff., ¶ 10.)

26. On December 14, 2001, Clark received his 2001 bonus from Crystal Rock, which was in the amount of $4,000. (Baker aff., ¶ 11.)

27. It was widely known to the people Clark worked with that he planned to move to Florida when he retired. Clark had become attracted to Florida as early as 1963, as a result of his father's interest in Florida, and as a result of visiting Florida to see family on three occasions. (Compl., ¶ 40; Clark Dep. at 112-113.)

28. In November 2001, Baker suggested to Clark that maybe he could make Clark's dreams come true by providing him with a retirement package which would allow Clark to move to Florida. At that time Clark said he was not interested in such a proposal, and the matter was not discussed further. (Compl., ¶ 39; Clark Dep. at 173-176.)

29. In January 2002, Clark renewed the discussion of the possibility of a retirement package with Baker, by asking Baker specifically what he had in mind. Baker told Clark he would have to think about it. (Clark Dep. at 177-178.)

30. About a week later, Clark met with Jurasek and Baker, and they discussed the possible components of a retirement package, including 26 weeks of severance, assistance with Clark's obtaining health insurance, and 3 or 4 additional weeks of pay as a consultant. (Clark Dep. at 182, 307.) At that meeting, Clark decided that he was going to leave Crystal Rock and move to Florida. (Clark Dep. at 183-187.)

31. At a subsequent meeting, Clark told Jurasek that he was disappointed with the amount of the retirement package that was being offered. Clark hoped that he would be able to negotiate a richer package. (Clark Dep. at 192-194.)

32. During Clark's discussions with Jurasek and Baker, December 31, 2002 was mentioned as the last day of Clark's employment at Crystal Rock. (Clark Dep. at 197-198.)

33. In March 2002, Clark told his son, who was then unemployed, that Clark had spoken to Baker about leaving Crystal Rock. They discussed moving to Florida and buying a bar. As of February or March 2002, Clark was investigating this and other possible business opportunities in Florida. (Clark Dep. at 115-129; 173.)

34. At a lunch to celebrate Clark's birthday on April 26, 2002, Clark told Frank Lantieri and some other co-workers that he was going to leave Crystal Rock by the end of the year, and that he was going to move to Florida to open a bar with his son. (Clark Dep. at 202-203.)

35. In May or June 2002, Clark had a conversation with his relatives who lived in Florida in which he told them that it looked like he would be leaving Crystal Rock by the end of the year, and that his intention was to move to Florida. (Clark Dep. at 191.)

36. The next conversation that Clark had with Crystal Rock management about his possible retirement was in the late spring, 2002. Clark told Baker that he was disappointed with the size of the retirement package that had been offered, and Baker indicated that the package could be enhanced through additional consideration relating to Clark's anticipated COBRA expenses. (Clark Dep. at 200-201.)

37. The described meeting in the late spring 2002 was the last time Clark spoke to Crystal Rock Management about a retirement package. (Baker aff., ¶ 15.)

38. In June 2002, Clark listed his home at 6 Haystack Circle in Waterbury, Connecticut for sale. By August or September 2002, Clark signed a contract for the sale of the house. (Clark Dep. at 179-181.)

39. On or about August 2, 2002, Clark's attorney wrote a letter to Baker, as president of Crystal Rock. The letter described Clark's circumstances at Crystal Rock and stated: "Any adverse job actions that have been or may be taken against [Clark] in these circumstances represent disability and/or age discrimination, illegal deprivation of employee benefits and constitute violations of his rights under the Americans with Disabilities Act, ERISA and the Age Discrimination in Employment Act, as well as the Connecticut Fair Employment Practices Act. The severance package you have proposed does not account for the fact the (sic.) Mr. Clark's expression of an interest in leaving was caused by Crystal Rock's wrongful and discriminatory conduct toward him or for the fact that the economic consequences to him of leaving are enormous." The letter went on to state that the premature termination of Clark's employment would cause him losses totaling $1,271,400, on the assumption that if his employment were not terminated, Clark would work until 2010. (Baker Aff., Tab A.)

40. Prior to his attorney sending the August 2, 2002 letter, Clark had never complained or spoken to anyone at Crystal Rock about being a victim of

discrimination or harassment based on Clark's age, or on any alleged or perceived disability. (Baker aff., ¶ 17.)

41. Prior to his attorney sending the August 2, 2002 letter, Clark had never complained to anyone at Crystal Rock about having been forced to transfer from the sales manager position to the manager of human resources position. (Baker aff., ¶ 17.)

42. Crystal Rock's management felt that the claims made in Clark's attorney's August 2, 2002 letter were unfounded, and were made in order to extract a better offer concerning Clark's retirement package. It was felt that Clark's conduct was unacceptable, since Clark was Crystal Rock's principal liason with its employees. (Baker aff., ¶ 19.)

43. All of the individuals at Crystal Rock and Vermont Pure who were involved in the decision to terminate Clark's employment were over 40 years of age. (Baker aff., ¶ 18.)

44. Clark never felt that anyone at Crystal Rock was hostile toward him because of any alleged or perceived disability. When employees at Crystal Rock became aware of his diagnosis, he received expressions of support. (Clark Dep. at 214, 272.)

45. On or about September 19, 2002, Baker told Clark that if he would retract the discrimination and related claims in the August 2, 2002 letter, he could continue working at Crystal Rock. Clark refused to retract the claims and his employment was terminated, effective September 30, 2002. (Compl., ¶ 58; Clark Dep. at 228-229.)

46. After Clark's employment was terminated, Crystal Rock twice offered Clark new employment in Crystal Rock's customer retention department. Clark rejected the offers. (Clark Dep. at 169; Clark Dep. Ex 6; Baker aff., ¶ 20, Tab B.)

**CRYSTAL ROCK LTD PLAN**

47. On or about April 1, 1985, Crystal Rock adopted the LTD Plan for the benefit of eligible employees. (Compl., ¶ 15.)

48. The LTD Plan provides a monthly disability benefit, payable in the event that an employee is unable to work due to disability, in an amount equal to the lesser of 60% of salary or $5,000. (Loftus aff., Policy, Tab A, p. PRLMS 00287.)

49. Clark has never been disabled within the meaning of the LTD Plan. He was physically able to work throughout his employment at Crystal Rock. After his employment was terminated, Clark moved to Florida and sought full time employment. Currently, he runs a restaurant in Florida. (Clark Dep., at 118-124.))

50. At or about the time the LTD plan was established, Clark received a copy of the plan and a Summary Plan Description. Subsequently, Clark periodically received other plan documents that were distributed by Crystal Rock at annual seminar meetings. (Clark Dep. at 238-241.)

51. The LTD Plan was a fully insured plan. As such, all of the benefits provided under the plan were provided through the purchase of a group insurance policy. Prior to September 1, 1991, coverage was provided under a group insurance policy issued by Mutual Benefit Life Insurance Company. (Baker aff., ¶ 21.)

52. Effective September 1, 1991, coverage was provided under a group insurance policy issued by the Paul Revere Life Insurance Company. ("Paul Revere."). (Loftus aff., ¶ 5.)

53. Effective September 1, 1991, the terms of the LTD Plan were set forth in two documents: (i) Paul Revere Group Policy Number G-24471 ("Policy"), and (ii) a benefit summary entitled "LTD-Group Insurance from the Paul Revere Life Insurance Company" (Loftus aff., ¶ 5,7; Policy, Tab A; Benefit Summary, Tabs B, C.)

54. Section 7 of the Policy is entitled "Termination of this Policy." The Policy provides that Crystal Rock "may cancel the entire contract or may cancel certain participating employers and their employees at any time." In either case, Crystal Rock "must send us written notice and include the date the insurance will end." (Loftus aff., ¶ 5; Policy, Tab A, section 7, p. PRLMS 00321.)

55. The Benefit Summary provides that coverage under the LTD Plan automatically terminates on the earliest of: (i) the date the Policy terminates; (ii) the date an employee no longer works in an eligible class; and (iii) the date an employee no longer works for Crystal Rock. (Loftus aff., ¶ 7, 8, 10, Benefit Summary, Tab C, General Provisions, p. PRLMS 00145.)

56. As part of the Crystal Rock-Vermont Pure merger, it was agreed that Crystal Rock's management would receive compensation to fund the cost of private long term disability insurance following the merger. Crystal Rock's management mistakenly believed that only Crystal Rock's management was covered under Crystal Rock's LTD plan and that non-management employees were not covered. Since management was to be compensated for the cost of long term disability insurance following the merger, and based on the mistaken assumption that Crystal Rock employees were not covered under the LTD plan, Crystal Rock cancelled the LTD plan, effective July 31, 2000. (Jurasek Dep. at 100-102; Jurasek aff., ¶ 4.)

57. The LTD Plan was terminated in accordance with the Policy provisions (see ¶ 54, above). By letter dated June 28, 2000, Crystal Rock advised UnumProvident Corporation, successor to Paul Revere, that the LTD Plan would be terminated,

and the insurance coverage under the Policy ended, both effective July 31, 2000. (Loftus aff., ¶ 12., Termination letter, Tab D.)

58. As of July 2000, Clark was aware that the LTD Plan had been cancelled. In September 2002, his attorney wrote to Crystal Rock and asked that copies of the plan documents be produced. (Clark Dep. at 244-245; Compl., ¶ 53.)

59. Mike Dunn, Crystal Rock's human resource manager, was never instructed to conceal the LTD Plan termination from employees. (Dunn Dep. at 65-67.)

60. Since it was believed that non-management employees were not covered under the LTD Plan (see ¶ 56, above), non management employees were not notified of the cancellation of the plan. (Jurasek aff., ¶ 4.)

61. In addition to his coverage under the LTD Plan, while Clark was employed at Crystal Rock, he purchased a private long term disability policy. With the combined coverage of the LTD Plan and the private policy Clark purchased, and based on Clark's earnings, he had as much long term disability coverage as was available to him under prevailing industry standards. (Clark Dep. at 248-251, 268-270; Clark Dep., Ex. 13; Katz Report.)

62. Crystal Rock's LTD Plan had no conversion rights. (Loftus aff., ¶ 13.)

**CRYSTAL ROCK SEVERANCE PLAN**

63. Crystal Rock did not maintain a severance plan, written or otherwise. There is no mention of a severance plan in the company handbook, or in any company policy. (Baker aff., ¶ 23; Dunn Dep. at 67.)

64. Crystal Rock on occasion paid severance to departing employees in exchange for a release of claims. (Dunn Dep. at 67, 82-83; Clark Dep. at 89, 90, 312-313.)

65. No departing employee at Crystal Rock ever received an offer as large as the 26 weeks offer that was made to Clark. (Clark Dep at 312-313.)

Respectfully submitted,

DEFENDANTS, VERMONT PURE HOLDINGS, LTD., CRYSTAL ROCK SPRING WATER COMPANY, CRYSTAL ROCK LONG TERM DISABILITY PLAN, and CRYSTAL ROCK SEVERANCE PLAN

By _____
A. Robert Fischer
CT 01295
Fischera@JacksonLewis.com
Daniel Green
CT 08746
Greend@JacksonLewis.com
Robert R. Perry
CT 22698
Perryr@JacksonLewis.com
**JACKSON LEWIS LLP**
177 Broad Street
P.O. Box 251
Stamford, CT 06904-0251
Phone: (203) 961-0404
Facsimile: (203) 324-4704
THEIR ATTORNEYS

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed, this date, postage prepaid, to: Kathryn Emmett, Esq., Emmett & Glander, 45 Franklin Street, Stamford, CT 06901.

_____
A. Robert Fischer