IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIAN CLARK, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:02 CV 2278 (MRK) |
| | : | |
| v. | : | |
| | : | |
| VERMONT PURE HOLDINGS, LTD., ET AL. | : | |
| Defendants. | : | |
| | : | JULY 1, 2005 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

I. INTRODUCTION ..................................................................... 1

II. STATEMENT OF FACTS .......................................................... 2

III. ARGUMENT ........................................................................... 18

    A. STANDARDS ................................................................... 18

    B. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISCRIMINATION CLAIMS ................................ 19

        1. Standards ............................................................... 19

        2. The evidence in this case establishes that defendants took adverse action against plaintiff because of his disability and/or age ................ 23

            a. Discrimination on the basis of disability *and* age. ............... 24

            b. Disability discrimination ........................................ 27

            c. Age discrimination ............................................. 28

            d. Pretext ......................................................... 31

        3. The remainder of defendants' arguments do not entitle them to summary judgment ................................................. 34

            a. Plaintiff is not required to establish "severe or pervasive" harassment by defendants ...................................... 34

            b. The evidence establishes discrimination *because* of plaintiff's disability and/or age ............................................... 36

            c. Defendants are not entitled to same-group inference ............... 38

C. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIMS ... 40

    1. Standards ... 41

        a. Protected activity ... 41

    2. Plaintiff was engaged in protected activity ... 42

    3. The evidence establishes that plaintiff was terminated because of his complaint to defendants ... 45

D. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR VIOLATION OF ERISA ... 48

    1. Facts pertaining to plaintiff's ERISA claims ... 49

    2. Defendants either did not, in fact, terminate the LTD Plan or terminated the Plan, by mistake, in breach of their fiduciary duties under ERISA ... 54

    3. Defendants terminated plaintiff's employment in violation of § 510 of ERISA, 29 U.S.C. § 1140 ... 60

    4. Plaintiff seeks appropriate equitable relief pursuant to 29 U.S.C. § 1132 (a)(3) ... 64

    5. Defendants refused to provide plaintiff with LTD Plan documents in violation of ERISA ... 66

    6. Vermont Pure is a proper party ... 67

IV. CONCLUSION ... 69

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Abbruscato v. Empire Blue Cross and Blue Shield, 274 F.3d 90 (2d Cir. 2001) .......... 58, 59

Acrey v. American Sheep Industry, 981 F.2d 1569 (10th Cir.1992) .......... 29, 30

Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970) .......... 18

Alexander v. Gerhardt Enterprises, Inc., 40 F.3d 187 (7th Cir.1994) .......... 43

American Federation of Grain Millers, AFL-CIO, 116 F.3d 976 (2d Cir. 1997) .......... 60

Beason v. United Technology Corp., 337 F.3d 271 (2d Cir. 2003) .......... 20

Bickerstaff v. Vassar College, 196 F.3d 435 (2d Cir.1999) .......... 36

Biggers v. Wittek Industries, Incorporated, 4 F.3d 291 (4th Cir. 1993) .......... 57

Braverman v. Penobscot Shoe Company, 859 F.Supp. 596 (D.Maine 1994) .......... 26, 38

Brown v. Lester E. Cox Medical Centers, 286 F.3d 1040 (8th Cir.2002) .......... 28

Brown v. Louisiana Lottery Corp., 240 F. Supp.2d 590 (M.D.La. 2002) .......... 48

Byrnie v. Town of Cromwell, 243 F.3d 93 (2d Cir.2001) .......... 21

Calhoun v. ACME Cleveland Corporation, 798 F.2d 559 (1st Cir.1986) .......... 30, 31, 37

Carlton v. Mystic Transportation, 202 F.3d 129 (2d Cir.2000) .......... *passim*

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .......... 18

Chambers v. TRM Copy Centers Corp., 43 F.3d 29 (2d Cir.1994) .......... 18

Cifra v. General Electric Co., 252 F.3d 205 (2d Cir.2001) .......... 48

Cinelli v. U.S. Energy Partners, 77 F.Supp.2d 566 (D.N.J. 1999) .......... 27, 28

Coan v. Kaufman, 333 F.Supp. 2d 14 (D.Conn. 2002) .......... 65

Colwell v. Suffolk County Police Dept., 158 F.3d 635 (2d Cir.1998) .......... 20

Contrast Joyce v. Curtiss-Wright Corporation, 171 F.3d 130 (2d Cir. 1999) .................... 59

Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73 (1995) ............................. 58

Danzer v. Norden Sys., Inc., 151 F.3d 50 (2d Cir.1998) ................................ 29

De Pace v. Matsushita Electric Corporation of America, 257 F.Supp. 2d 543 (E.D.N.Y. 2003) ...... 65

DeCintio v. Westchester County Medical Center, 821 F.2d 111 (2d Cir.),
cert. denied, 484 U.S. 965 (1987) ................................................ 46

Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d. 76 (2d Cir. 2001) ..................... 59

Dick v. Phone Directories Company, Inc., 397 F.3d 1256 (10th Cir.2005) ..................... 14

Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir. 1988) ........................... 63

Douglas v. DynMcDermott Petroleum Operations Company, 144 F.3d 364 (5th Cir. 1998) ......... 44

Equal Employment Opportunity Commission v. R.J. Gallagher Company,
181 F.3d 645 (5th Cir.1999) .................................................... 27

Farley v. Nationwide Mutual Insurance Company, 197 F.3d 1322 (11th Cir.1999) ............... 23

Feifer v. Prudential Life Insurance Company of America, 306 F.3d 1202 (2d Cir. 2002) .......... 56

Fierros v. Texas Department of Health, 274 F.3d 187 (5th Cir.2001) .................. 46, 47, 52

Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989) ............................. 64

Foster v. Time Warner Entertainment Company, 250 F.3d 1189 (8th Cir.2001) ................. 48

Francis v. City of Meriden, 129 F.3d 281 (2d Cir.1997) ................................. 20

Galambos v. Fairbanks Scales, 144 F.Supp.2d 1112 (E.D.Mo. 2000) ........................ 24

Giordano v. Gerber Scientific Products, Inc., 2000 WL 1838337
(D.Conn., Burns, J., Nov. 14, 2000) ............................................... 38

Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313 (3d Cir.2000) .................. 22, 40

Graham v. Texasgulf, Inc., 662 F.Supp. 1451 (D.Conn. 1987) .......................... 42, 44

Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204 (2002) .................... 65

Gregory v. Daly, 243 F.3d 687 (2d Cir.2001) ................................................ 48

Griggs v. E.I. DuPont De Nemours & Company, 237 F.3d 371 (4th Cir. 2001) .................. 65

Heyman v. Queens Village Committee for Mental Health, 198 F.3d 68 (2d Cir.1999) ........... 21

Holdren v. General Motors Corp., 1998 WL 990997 (D.Kan. 1998) ......................... 31, 37

Holtz v. Rockefeller & Co., Inc., 258 F.3d 62 (2d Cir.2001) ............................. 21, 36

Howley v. Town of Stratford, 217 F.3d 141 (2d Cir.2000) ................................... 35

Millane v. Becton Dickinson & Co., 84 F.Supp.2d 282 (D.Conn. 1999) ..................... 21, 38

In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 57 F.3d 1255
(3d Cir. 1995) ........................................................................... 59

Ingersoll-Rand Company v. McClendon, 498 U.S. 133 (1990) .................................. 62

Inter-Modal Rail Employees Association v. Atchison, Topeka and Santa Fe Railway
Company, 520 U.S. 510 (1997) ........................................................... 58, 62

James v. New York Racing Association, 233 F.3d 149 (2d Cir.2000) .......................... 22

Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025 (5th Cir.1980) ........ 22, 40

Johnson v. University of Cincinnati, 215 F.3d 561 (6th Cir.2000) .......................... 44

Kadas v. MCI Systemhouse Corp., 255 F.3d 359 (7th Cir.2001) ............................... 39

Kascewicz v. Citibank, N.A., 837 F. Supp. 1312 (S.D.N.Y. 1993) ......................... 64, 67

Keller v. Board of Educ. of the City of Albuquerque, 182 F.Supp.2d 1148 (D.N.M. 2001) .. 26, 34

Kerzer v. Kingly Manufacturing, 156 F.3d 396 (2d Cir.1998) ................................ 19

Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208 (2d Cir.2001) ....................... 41

Malik v. Carrier Corp., 202 F.3d 97 (2d Cir.2000) ......................................... 14

Manoharan v. Columbia University College, 842 F.2d 590 (2d Cir.1988) ...................... 42


Mathews v. Chevron Corporation, 363 F.3d 1172 (9th Cir. 2004) .................................. 66

Matima v. Celli, 228 F.3d 68 (2d Cir.2000) .................................. 42

McCrory v. Kraft Food Ingredients, 98 F.3d 1342, 1996 WL 571146 (6th Cir. 1996) ........ 23, 24, 25

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .................................. 21

McInnis v. Alamo Community College District, 207 F.3d 276 (5th Cir.2000) .................................. 31

Millsap v. McDonnell Douglas Corporation, 368 F.3d 1246 (10th Cir. 2004) .................................. 65

Nappi v. Meridian Leasing Corp., 1995 WL 431183 (N.D.Ill., July 17, 1995, Nordberg, J.) .................................. 43

Newtown v. Shell Oil Company, 52 F.Supp.2d 366 (D.Conn. 1999) .................................. 20

Olmstead v. Zimring, 527 U.S. 581 (1999) .................................. 39

Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998) .................................. 38

Ortiz v. Norton, 254 F.3d 889 (10th Cir.2001) .................................. 35

Ostrowski v. Atlantic Mutual Insurance Companies, 968 F.2d 171 (2d Cir.1992) .................................. 45

O'Connor v. Consolidated Coin Caterers Corporation, 517 U.S. 308 (1996) .................................. 39

O'Neal v. Ferguson Construction Company, 237 F.3d 1248 (10th Cir.2001) .................................. 41, 45

Perry v. Woodward, 199 F3d 1126, 1140 (10th Cir.), cert. denied, 529 U.S. 1110 (2000) .................................. 35

Phillips v. Reed's Supermarket, 1998 WL 527227 (N.D.Miss., July 24, 1998, Davidson, J.) .................................. 26

Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir.1997) .................................. 21

Rattner v. Netburn, 930 F.2d 204 (2d Cir.1991) .................................. 18

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) .................................. *passim*

Regional Economic Community Action Program v. City of Middletown,
294 F.3d 35, 54 (2d Cir.2002) .................................. 41, 44

Rhoads v.FDIC, 257 F.3d 373 (4th Cir.), cert. denied, 535 U.S. 933 (2002) .................................. 46

Rose v. New York City Board of Education, 257 F.3d 156 (2d Cir.2001) ..................... 45

Rubinstein v. Administrators of the Tulane Educational Fund, 218 F.3d 392 (5th Cir.2000) ......... 46

Russell v. Northrop Grumman Corporation, 921 F.Supp. 143 (E.D.N.Y. 1996) ................. 65

Sampson v. Rubin, 2002 WL 3143270 (D. Mass. 2002) ........................... 67

Schonholz v. Long Island Jewish Medical Center, 87 F.3d 72 (2d Cir. 1996) ................. 59

Seltzer v. Dresdner Kleinwort Wassertstein, 356 F.Supp.2d 288 (S.D.N.Y. 2005) .............. 37

Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir.1995) ........................ 33

Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640 (7th Cir.),
cert. denied, 537 U.S. 879 (2002) ..................................... 45

Sumner v. United States Postal Service, 899 F.2d 203 (2d Cir.1990) ..................... 41

Tardif v. General Electric Co., 2000 WL 33376644 (D. Conn 2000) ..................... 60

Terry v. Ashcroft, 336 F.3d 128 (2d Cir.2003) ............................. 41, 45

United States v. One Tintoretto Painting, 691 F.2d 603 (2d Cir.1982) ..................... 18

Varity Corporation v. Howe, 516 U.S. 489 (1996) ........................ 60, 65, 66

Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir.2003) ................... 39

Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir.1988) ...................... 34

Zimmerman v. Associates First Capital Corp., 251 F.3d 376 (2d Cir.2001) ................ 22, 31

**STATE CASES**

Ann Howard's Apricots Restaurant, Inc. v. CHRO, 237 Conn. 209, 216 (1996) ................. 21

CHRO, ex rel. Samuel Tucker v. General Dynamics Corp., 1991 WL 258041
(Conn.Super., Nov. 22, 1991, Axelrod, J.) ................................. 21

Ezikovich v. Connecticut Commission on Human Rights & Opportunities, 750 A.2d 494
Conn.App.767 (2000) ............................................ 20

Mills v. Re/Max Heritage, 2005 WL 941400 (Conn.Super., March 16, 2005, Lewis, J.T.R.) . . . . . . . . 21

**FEDERAL STATUTES**

29 U.S.C. § 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 1132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 66

29 U.S.C. § 1140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 60

29 U.S.C. § 623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 41

29 U.S.C. § 631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

29 U.S.C. §1002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 68

29 U.S.C. §1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

29 U.S.C. §1140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 62

29 U.S.C. § 1022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

29 U.S.C. § 1024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 12102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

42 U.S.C. § 12112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 12203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------- x
BRIAN CLARK,                                        :    CIVIL ACTION NO.
    Plaintiff,                                     :    3:02 CV 2278 (MRK)
                                                    :
v.                                                  :
                                                    :
VERMONT PURE HOLDINGS, LTD., ET AL.                 :
    Defendants.                                    :
---------------------------------------------------- x    JULY 1, 2005

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Brian Clark submits this memorandum in opposition to defendants' Motion for Summary Judgment dated February 16, 2005.

**I.    INTRODUCTION**

Plaintiff, who was diagnosed with Parkinson's disease in 1999 and terminated from his employment in 2002 when he was 50 years old, commenced this action against his former employer, Vermont Pure Holdings, Ltd. d/b/a Crystal Rock Bottled Water and Vermont Pure [hereinafter "Vermont Pure Holdings"] and Crystal Rock Spring Water Company [hereinafter "Crystal Rock"], to seek redress for discrimination on the basis of his disability and/or age and discriminatory and/or retaliatory discharge of his employment pursuant to the Americans with Disabilities Act [ADA], 42 U.S.C. §12101 *et seq.*, the Age Discrimination in Employment Act [ADEA], 29 U.S.C. §621 *et seq.*, and Connecticut's Fair Employment Practices Act [CFEPA], C.G.S. §46a-51 *et seq.*. Plaintiff also seeks relief under the Employee Retirement Income Security Act [ERISA], 29 U.S.C. § 1001 *et seq.*, in connection with defendants' breach of fiduciary duties under 29 U.S.C. § 1104 *et seq.*; wrongful termination of his employment in violation of 29 U.S.C. § 1140; and failure to provide requested plan documents in

violation of 29 U.S.C. §§ 1022, 1024 and 1132.[1]

## II. STATEMENT OF FACTS

The facts supporting plaintiff's claims are set forth below.[2]

- Plaintiff Brian Clark began working at Crystal Rock in 1973 when he was 21 years old as a Route Salesman. See Ex. 1 (B. Clark) at 6-7. He was promoted to Supervisor in 1979, to Director of Route Sales in 1985 and to Sales Manager, reporting to the Vice President in 1992. See Ex. 13.

- Plaintiff was an exemplary employee throughout the course of his nearly 30 years of employment at Crystal Rock.[3] The only written performance evaluation he ever received rated him at 100%.[4]

- In 1998, plaintiff began to experience visible tremors in his hands. In fact, John Woerner, a co-worker in the sales department, commented in or about December 1998 as he was walking by

---

[1] As a result of information obtained in discovery, as set forth *infra*, plaintiff has narrowed his ERISA claims and is not pursuing the claims for technical violations [Second Count], estoppel [Third Count] and failure to pay severance benefits [Fifth Count] set forth in his Third Amended Complaint.

[2] All exhibits referenced herein are attached to the Affidavit of Attorney Kathryn Emmett in Support of Plaintiff's Opposition to Summary Judgment dated July 1, 2005 [KE Aff.].

[3] In fact, according to Henry Baker, who took over the company from his father in the 1950's and ran the business until the early 1990's when his sons Peter and Jack became co-presidents, "[plaintiff] was extremely energetic, loyal, and probably the best employee [the company] had over the years." Ex. 2 (H. Baker) at 10-16. See also Ex. 1 (B. Clark) at 43 (testifying that he believed his performance was always at least acceptable to upper management until the beginning of 2000, as set forth *infra*), 300; Ex. 3 (P. Baker) at 16, 25, 33-34 (Peter Baker, who began working at the company in 1977 and to whom plaintiff reported as Director of Route Sales, testifying that he was pleased with plaintiff's performance in Route Sales and that, as Sales Manager, plaintiff was "a very compassionate leader" and "very devoted to the company"); Ex. 12 (Monte) at 26-27, 31-33.

[4] See Ex. 14 (1997 evaluation by plaintiff's supervisor, Gene Monte, who was manager of the sales department and Vice President, stating: "Over the many years that Brian has been with the company, he has consistently displayed team spirit, enthusiasm, good attitude and a desire to get the job done. . . . we could use more people like Brian at Crystal Rock, but they're hard to find."). See also Ex. 12 (Monte) at 13.

2

- plaintiff's office "What, do you have Parkinson's or something?"[5]

- At the same time that his tremors became visible to others, plaintiff began to experience a negative attitude – in particular from his supervisor, Peter Baker, then President of Crystal Rock – concerning his work performance even though there had been no change in the quality of his work. See Ex. 1 (B. Clark) at 40, 58-60.[6] At that time, plaintiff had been successfully performing as the company's Sales Manager since 1992.[7]

- In December 1999, plaintiff was diagnosed with Parkinson's disease. See Ex. 1 (B. Clark) at 212. He immediately told Peter Baker of his diagnosis. See id. at 213; Ex. 3 (P. Baker) at 14-15, 46-47. Thereafter, Baker's negativity toward plaintiff increased noticeably, and plaintiff began to feel that his performance was no longer acceptable to Baker.[8]

- In May 2000, Crystal Rock announced that it would be merging with Vermont Pure and immediately thereafter the merger planning began. See Ex. 1 (B. Clark) at 66; Ex. 3 (P. Baker) at 75-77.

- Plaintiff, who as Sales Manager was a key member of Crystal Rock's management team,

---

[5] See Ex. 1 (B. Clark) at 212-14; Ex. 3 (P. Baker) at 47-48 (he noticed tremors prior to plaintiff's diagnosis).

[6] Peter Baker was approximately 39 years old at the time and oversaw the sales and service functions of the company. See Ex. 3 (P. Baker) at 15; Ex. 9 (Jurasek) at 14-15. His brother, Jack, was responsible for production and the administrative functions of the company and was approximately 44. See Ex. 3 (P. Baker) at 15; Ex. 9 (Jurasek) at 15.

[7] See Ex. 1 (B. Clark) at 43 (testifying that he believed his performance was always at least acceptable to upper management until the beginning of 2000, as set forth *infra*), 300; Ex. 2 (H. Baker) at 10-16; Ex. 12 (Monte) at 26-27, 31-33; Ex. 14.

[8] See Ex. 1 (B. Clark) at 40-43 (plaintiff started to feel like he couldn't do anything right in Peter Baker's eyes in early 2000), 101 (Baker seemed increasingly unhappy with plaintiff's performance and when plaintiff inquired why, Baker responded only that he had "heard some things," but refused to elaborate further).

3

- perceived that he, unlike his counterparts who headed other departments at Crystal Rock, was left out of the planning process; when he brought this concern to Baker's attention, he was brushed off.[9]

- Then, in or about June 2000, Mike Dunn, who was Crystal Rock's departing head of Human Resources, called plaintiff and disclosed to him that upper management was planning to make a change in the sales department, that plaintiff was likely not to continue as Sales Manager post-merger, and that it would be, therefore, in his best interest or a "smart move" to consider requesting a transfer to the open HR Manager position. See Ex. 1 (B. Clark) at 67. Plaintiff's wife, Sally Clark, who was traveling in the car with plaintiff when he received the phone call from Dunn on speaker phone, also understood that Dunn "implied that [plaintiff] was not going to be in sales and that he should take the [HR] position." Ex. 5 (S. Clark) at 12.

- Plaintiff credited Dunn's advice both because he believed that Dunn, as head of HR, was in a position to know what the staffing plans were post-merger and because plaintiff had been experiencing increasing criticism of his performance as Sales Manager and had been left "out of the loop" with respect to the merger planning.[10]

- As a result of Dunn's advice, plaintiff asked to be considered for and was given the HR position.

---

[9] See Ex. 1 (B. Clark) at 106-7, 301-2. See also Ex. 5 (S. Clark) at 17. The department heads who were included in the merger planning were younger than plaintiff and in their 30's or early 40's like Peter Baker or even younger at the time. See Affidavit of Peter Baker dated February 10, 2005 [Baker Aff.], submitted in conjunction with Defendants' Memorandum of Law dated February 16, 2005 [Def.Mem.], ¶18; Affidavit of Brian Clark dated July 1, 2005 [BC Aff.], submitted herewith, ¶ 2.

[10] See Ex. 1 (B. Clark) at 71-75, 106-107, 297-98. See also Ex. 5 (S. Clark) at 17-19 (plaintiff's wife, who also worked at Crystal Rock for many years, testifying that she believed Dunn's information was credible because, as personnel manager, he would be in a position to know about personnel changes at the company).

4

See Ex. 1 (B. Clark) at 67, 73, 96, 101.[11]  Plaintiff began training with Dunn and transferred to the HR position on or about July 1, 2000.  See Ex. 1 (B. Clark) at 103.  See Ex. 6 (Dunn) at 32-33.[12]

- The HR position did not represent a promotion, and plaintiff did not receive a salary increase when he transferred to HR.  See BC Aff., ¶ 3.

- Peter Baker then appointed John Woermer to replace plaintiff as Sales Manager.  See Ex. 3 (P. Baker) at 64-65; Ex. 7 (Fallon) at 23.[13]  Woermer, like Baker and the other department heads who had been included in the merger planning [see n. 8, *supra*], was several years younger than plaintiff and in his early 40's at the time.  See n.9 *supra*; Ex. 1 (B. Clark) at 299.

- The merger between Crystal Rock and Vermont Pure was finalized in October 2000,

---

[11] Plaintiff initially questioned whether he had the knowledge to do the HR job, but Dunn assured him that he thought he would be successful at the job because he was personable and that he would be able to train him regarding the technical aspects.  See Ex. 1 (B. Clark) at 67, 73, 96.  Consistent with Dunn's warning that plaintiff's position in sales was insecure, when plaintiff approached Peter Baker about the possibility of the transfer, Baker did not communicate to plaintiff that he was considered a valuable member of the sales' management team or that he should not leave the Sales Manager position.  See Ex. 1 (B. Clark) at 97; Ex. 3 (P. Baker) at 69-72.  Baker approved plaintiff's transfer, but told plaintiff that he "better not do in HR what he did in sales" and said nothing when plaintiff asked what he meant by the comment.  See Ex. 1 (B. Clark) at 96-101; Ex. 3 (P. Baker) at 72-73, 96.

[12] Dunn continued to work at the company for a few weeks to train plaintiff and then stayed on as a consultant until the end of the summer or early fall at the latest.  See Ex. 6 (Dunn) at 32-33.  Dunn described plaintiff's attitude as "[v]ery willing, very, very focused on looking forward to doing a good job. . . [v]ery positive."  See id. at 34.

[13] Before the merger, there were three upper level managers in the Sales Department – plaintiff, Gene Monte and John Woermer, who was initially hired to develop retail sales for the company, but, after that venture proved unsuccessful "bounced a bit" between marketing, advertising and vending-related responsibilities.  See Ex. 1 (B. Clark) at 51; Ex. 3 (P. Baker) at 62-64, 92-93.  After the merger and plaintiff's transfer to HR, the Sales Department was reorganized and run by only two upper level managers – Woermer and Monte.  See Ex. 9 (Jurasek) at 200-202; Ex. 12 (Monte) at 24-25, 36.  The job responsibilities that Woermer previously held were assigned to other employees.  See Ex. 3 (P. Baker) at 93-94.

5

approximately 3 months after plaintiff transferred into the HR position.[14] As a result of the merger, the number of employees working for Crystal Rock more than doubled from approximately 150 to 325; thus, plaintiff was assigned responsibility for more than twice the number of employees on a daily basis and was required to manually enter information relating to these new employees into the payroll database and. See Ex. 1 (B. Clark) at 110-12, 148-53; Ex. 3 (P. Baker) at 91, 96; Ex. 7 (Fallon) at 15; Ex. 30 (Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories), ¶8 (identifying number of Crystal Rock employees in 2000 as 149 and post-merger in 2001 as 323).[15] In addition, the company changed benefit plans and 3rd party administrators and established a new and uniform set of policies and procedures for the employees of both Crystal Rock and Vermont Pure resulting in voluminous paperwork, including new benefits applications from all employees and numerous requests and questions from employees who were not familiar with the new plans or procedures. See Ex. 1 (B. Clark) at 112, 149, 152.

- Baker also assigned plaintiff responsibility for purchasing and installing a new telephone system for the company and for the company's damage claims, which coincidentally dramatically increased after the merger because new water bottles used by the company leaked. See Ex. 1 (B.

---

[14] Crystal Rock and Vermont Pure merged to form Vermont Pure Holdings, Ltd. [Vermont Pure Holdings]. See Ex. 3 (P. Baker) at 14; Ex. 7 (Fallon) at 9. The former CEO of Vermont Pure, Timothy Fallon, became CEO of Vermont Pure Holdings, and Peter Baker became President. See Ex. 7 (Fallon) at 8-9, 19. Baker technically reported to Fallon in that position, but Crystal Rock and Vermont Pure continued to operate as separate divisions, and Fallon "pretty much left it up to Peter [Baker]" to run Crystal Rock. See Ex. 7 (Fallon) at 19.

[15] Like Mike Dunn before him, plaintiff was the only employee at Crystal Rock with responsibility for the HR function. See Ex. 3 (P. Baker) at 96-97. Vermont Pure also had one employee with HR responsibilities who was located in its Vermont office; however, after the merger, Crystal Rock's HR Manager – i.e., plaintiff – became responsible for the vast majority of the former Vermont Pure employees in addition to the existing Crystal Rock employees. See Ex. 1 (B. Clark) at 109-12.

Clark) at 149-51, 291.

- Additional staff was hired to assist the Controller and the Customer Service Department because of the increased work load resulting from the merger, but not to assist plaintiff in HR, and plaintiff was inundated by work and had to work nights and weekends for weeks at a time and even enlisted his wife to assist him with his work after hours on occasion. See Ex. 1 (B. Clark) at 136, 149-54; Ex. 3 (P. Baker) at 96-97; Ex. 5 (S. Clark) at 33-34[16]; Ex. 9 (Jurasek) at 13-16.

- Plaintiff informed both Peter Baker and the company's Controller, David Jurasek,[17] that he was overwhelmed by the workload and requested assistance and/or reassignment of certain responsibilities such as the damage claims, but they refused to make any changes to alleviate the burden other than by allowing a temporary employee who was assigned to another department to help plaintiff on an unpredictable basis when she was available. See Ex. 1 (B. Clark) at 135-36, 151-53, 291, 294-95; Ex. 3 (P. Baker) at 96-97, 108; Ex. 9 (Jurasek) at 30, 38. See also Ex. 16 (contemporaneous "talking points" memo prepared by plaintiff).[18]

- Then, in November 2001, when plaintiff was just 49 years old, Baker called plaintiff into his office and suggested that the company might be able "to make [his] dreams come true" if he would

---

[16] Plaintiff's wife, Sally Clark, had been employed by the company previously, as a receptionist and as editor of the company newsletter for approximately 15 years, and had also been employed as a caregiver for Henry Baker's mother, Gladys. See Ex. 2 (H. Baker) at 9; Ex. 5 (S. Clark) at 4-6, 9.

[17] Like Peter Baker, Jurasek was younger than plaintiff and in his early 40's at the time. See Ex. 9 (Jurasek) at 9.

[18] Thus, even though they knew that the merger caused an increased workload for HR and that plaintiff was overwhelmed, upper management rejected his requests for help, claiming that it wasn't financially feasible to hire additional help and/or that plaintiff should have been able to complete the work on his own and, in general, ignored and/or expressed irritation at plaintiff's requests for help. See Ex. 1 (B. Clark) at 140, 151-53, 293-94. In plaintiff's experience, it was company practice to make an employee's work load intolerable as a means of getting a disfavored employee to leave voluntarily. See Ex. 31 (Plaintiff's Response to Defendants' Third Set of Interrogatories), Nos. 2, 4, 6-8.

7

consider retiring to Florida at that time. See Ex. 1 (B. Clark) at 173, 303; Ex. 3 (P. Baker) at 118-20 (admitting conversation). Baker testified at deposition, and others confirmed, that he made the suggestion that plaintiff retire at age 49 *because of his Parkinson's disease and age.*[19]

- Plaintiff was completely taken aback by Baker's suggestion and immediately responded to Baker that he was not interested and had no intention of retiring at that time. See Ex. 1 (B. Clark) at 173-74; Ex. 3 (P. Baker) at 120 ("... basically he said that he was going to continue with his job. He wanted to do his job the right way, and he had no intentions of going earlier, and I said, 'Fine.'").[20]

- After plaintiff rejected the suggestion that he retire, the negative treatment to which upper management subjected him since he began having tremors and, in particular, after he was

---

[19] See Ex. 3 (P. Baker) at 118-21 ("... he was struggling with his job, and with his diagnosis. I wondered if, you know he was working here because he thought he had to, and he had to reached [sic] his goal of 55 before he could go, and I thought maybe if there would be a way to put something together that might allow him to go earlier if that's what he wanted to do."); Ex. 9 (Jurasek) at 64-66 (Baker told him he thought plaintiff would be interested in retiring at age 49 because of his Parkinson's diagnosis); Ex. 11 (Miller) at 205-6 (Baker told her that plaintiff "wanted to retire" and "wanted to go to Florida" and that plaintiff was "getting older, he had Parkinson's and that [Baker] – you know, he thought it would be a nice – it would be a good thing to do. He wanted to make it work for [plaintiff] if he could."). Although Baker claimed at deposition that there was no pressure on plaintiff to retire and that he was simply trying to do plaintiff a favor, he also testified that he was disappointed with plaintiff's performance as HR manager and, in particular, with his organizational skills in that "[plaintiff] seemed to have a hard time finding stuff when [Baker] asked for stuff in his office" and in that there was too much "lag time" in completing employee requests. Ex. 3 (P. Baker) at 107-8, 117-18. Baker also complained that plaintiff purportedly failed to seek "the education that [they] had talked about prior to him taking the job" even though plaintiff did, in fact, take several courses and Baker never requested that plaintiff take any additional classes. See id.; Ex. 1 (B. Clark) at 95. Baker's claim that he was only trying to help plaintiff by suggesting that he retire is belied, *inter alia*, by his negative attitude toward plaintiff's job performance. Baker testified that he could not recall a *single* positive aspect of plaintiff's performance as HR manager. See Ex. 3 (P. Baker) at 103, 108 ("Q. Did you give any thought to removing him from the position of HR Director? A. I would have to say yes.").

[20] Although, as Baker and others at Crystal Rock knew, plaintiff hoped to retire to Florida someday, he did not plan to retire for a number of years and could not, in any case, afford to retire at age 49. See Ex. 1 (B. Clark) at 113-14, 173-74. See also Ex. 6 (S. Clark) at 23 (plaintiff was surprised by Baker's suggestion that he retire because he wasn't ready and "didn't know what that meant").

diagnosed with Parkinson's disease escalated. For example:

- In November 2001, Peter Baker set the bonuses for his reports and handed plaintiff a sheet reflecting the amounts plaintiff and other key managers were to receive; plaintiff's bonus was cut in half while the bonuses awarded to the other key managers, with the exception of one manager who had transferred during the year into a lower status job, either remained the same or increased. See Ex. 1 (B. Clark) at 210.[21]

- Also in or about November 2001, Dave Jurasek humiliated plaintiff by screaming at him in a personally offensive manner in earshot of other employees when plaintiff submitted a bill that was in dispute to him after the books closed at year end.[22]

- In early January 2002, Baker and Jurasek summoned plaintiff to a meeting and informed him that they were planning to hire somebody with a "more thorough background in HR," perhaps a legal

---

[21] In particular, plaintiff received an $8,000 performance-related bonus at the end of both 1999 and 2000. See Ex. 3 (P. Baker) at 105; Ex. 17. In 2000 when the merger occurred, Crystal Rock also paid a one-time matching bonus to all "original" employees of Crystal Rock and, therefore, plaintiff received a total of $16,000 in bonuses that year. See Ex. 3 (P. Baker) at 38-39; Ex. 17; Ex. 18. As stated, in 2001, after plaintiff declined the suggestion that he retire, Peter Baker cut plaintiff's performance-related bonus in half to $4,000, without providing any explanation to plaintiff for the decrease. See Ex. 3 (Baker) at 133-35; Ex. 17; Ex. 18. As reflected by Exhibit 18, the bonus levels of the other key managers were maintained or increased at the end of 2001. See also Ex. 3 (P. Baker) at 132. One employee on the bonus list, Craig Kavanaugh, had transferred during the year out of his key manager position as Route Supervisor to a Plant Manager job and his bonus was also reduced, but not cut in half as plaintiff's was. See Ex. 3 (P. Baker) at 133-34; Ex. 18; BC Aff., ¶ 5.

[22] See Ex. 1 (B. Clark) at 218-20 ("he yelled as loud as he could possibly yell in an open office with the entire customer service and sales and every other employee in the main work area, in earshot of everybody. . . . It lasted for minutes. It seemed like minutes, and I'm sure it was several minutes. It was nonspecific, and it was personal, absolutely personal. . . . The reference was I was an idiot, some other things after being repeatedly told how stupid I could be to not have turned this bill in . . ."); Ex. 9 (Jurasek) at 40 (admitting that he screamed at plaintiff about bill); Ex. 5 (S. Clark) at 19 (testifying that it was embarrassing and upsetting to plaintiff when Jurasek blew up at him). See also Ex. 3 (P. Baker) at 123 (testifying that he was aware of the incident contemporaneously, but that he doesn't recall whether he discussed it with plaintiff afterwards).

background like Mike Dunn, and that plaintiff "could be his or her assistant or something."[23]

- As a result of the foregoing, plaintiff concluded that management wanted him to leave the company and, in or about February or March 2002, went to Baker and told him that he had "had it" and inquired what Baker was proposing when he said he "could make [plaintiff's] dreams come true" if he would consider retiring early to Florida. See Ex. 1 (B. Clark) at 178-9, 185-86, 309.[24]

- Baker and Jurasek subsequently met with plaintiff and offered him a package that would effectively give him one week of severance for each year of his service to the company (*i.e.*, 30 weeks) if he

---

[23] Ex. 1 (B. Clark) at 264-65, 279-83. See also Ex. 3 (P. Baker) at 151-52 (admitting that he discussed with plaintiff the fact that the company may need someone with "other credentials" in HR). Plaintiff questioned whether anything was wrong with his performance, but Baker did not explain his apparent dissatisfaction with plaintiff or, alternatively, reassure plaintiff about his position with the company in any way. See Ex. 1 (B. Clark) at 280-83, 311. In this same time period, plaintiff also offered to help in the sales area when he learned in or about December 2001 that his successor as Sales Manager, John Woermer, would be leaving the company; plaintiff also offered to assist in Customer Service when a management position in that department opened up in or about June 2002. See Baker Aff., ¶9; BC Aff., ¶¶ 6-7. Despite the fact that Peter Baker denies that he was intending to replace plaintiff as Sales Manager at the time of the merger in 2000 and claims that he *was* dissatisfied with plaintiff's performance as HR manager, Baker refused plaintiff's offers. See Ex. 3 (P. Baker) at 65-66 (testifying that he doesn't recall whether he gave any consideration to having plaintiff return to sales when Woermer's employment was terminated); BC Aff., ¶¶ 6-7.

[24] Baker did not seem surprised and responded only that he would have to think about a severance package and get back to plaintiff. See Ex. 1 (B. Clark) at 178-79. In fact, prior to or immediately after the discussion with plaintiff and before any severance terms had been agreed upon, Baker and Jurasek made arrangements to replace plaintiff as HR manager by offering Cheryl Gustafson, who was then 34 years old and employed as an accountant at Crystal Rock reporting to Jurasek, the HR position in February 2002. See Ex. 8 (Gustafson) at 6, 10, 13-15 (testifying that management offered her the HR position in February 2002: "I remember talking to Peter and Dave, and they had said Brian was going to retire, and: We would like to offer you the position."). In preparation for discussing severance with plaintiff, Jurasek furthermore prepared an analysis of the cost of having Gustafson rather than plaintiff in the position, and Gustafson even went to Washington D.C. to take an HR course the following month with Jurasek's approval. See Ex. 8 (Gustafson) at 15-16; Ex. 9 (Jurasek) at 67-68 (testifying that he prepared cost analysis prior to holding any meeting with plaintiff to discuss terms of severance because "[i]t was anticipated that [Gustafson] would be replacing Brian.").