retired from Crystal Rock. See Ex. 1 (B. Clark) at 182.[25]

- At the meeting, plaintiff explicitly stated to Baker and Jurasek that it was clear to him that they did not "want [him] there anymore," and neither refuted the statement.[26] In fact, Baker and Jurasek even acknowledged that they had been exhibiting hostility toward plaintiff, commenting that they knew "two people [who plaintiff wasn't] going to miss" when he left Crystal Rock. Ex. 1 (B. Clark) at 184-86.

- Plaintiff expressed to Jurasek on two subsequent occasions that he thought the proposal was unfair because the company had previously given a similar or better package to two employees that had been terminated *for cause*. See Ex. 1 (B. Clark) at 192-97. Plaintiff had never been informed that he was being terminated for cause and he did not *want* to leave; rather, he perceived that he was being forced out by management after almost 30 years of dedicated service to the company. See id.[27]

---

[25] They also suggested that if plaintiff had difficulty getting health insurance coverage after his COBRA coverage expired, he could "use the power of Crystal Rock to obtain health insurance." Ex. 1 (B. Clark) at 182-83. See also Ex. 3 (P. Baker) at 139; Ex. 9 (Jurasek) at 87-88. Baker's claim that he was merely trying to do plaintiff a favor by suggesting that he could "make [plaintiff's] dreams come true" if he would consider retiring early is belied by the fact that he did not offer plaintiff a "retirement package" – *i.e.*, a package designed to allow plaintiff to retire from his career, but rather a standard "severance package" – *i.e.*, a package that Crystal Rock paid to employees, including those terminated for cause, at least in part to provide them a cushion while they sought substitute employment. Jurasek testified at deposition that the proposal was structured as 6 months of severance plus a consulting agreement to reach a total of 30 weeks compensation because the company did not want to set a precedent of greater than 6 months "separation." See Ex. 9 (Jurasek) at 63, 71. According to Jurasek, the concern related at least in part to the fact that three Vermont Pure employees held employment contracts which provided for 6 months severance only. See id. at 63-64.

[26] See Ex. 1 (B. Clark) at 184, 304. See also Ex. 3 (P. Baker) at 136 (he doesn't recall whether plaintiff stated that they didn't want him to stay at the company).

[27] Even though plaintiff was unhappy with management's proposal, he discussed leaving by the end of the year because he knew management no longer wanted him there and believed he had no choice but to leave the company. See Ex. 1 (B. Clark) at 183-88, 197-98, 203. After the meeting with Baker and

11

- When plaintiff did not hear anything further from Baker or Jurasek, he approached Baker in or about May or June of 2002 and again reiterated his belief that the severance proposal was unfair. See Ex. 1 (B. Clark) at 198-201.[28] Baker, who was aware that plaintiff was interested in purchasing a restaurant in Florida when he left Crystal Rock [see n.27 *supra*], then told plaintiff that his father, Henry Baker, might be willing to provide funding for the purchase. See Ex. 1 (B. Clark) at 201-205. See also Ex. 3 (P. Baker) at 145-46. Baker informed plaintiff that his father was going to be in Florida and that he would make an effort to meet with plaintiff to see one particular business that plaintiff was interested in with the intention that, if he was able to purchase the business and work out departure terms with Crystal Rock, his son would operate the restaurant until plaintiff could join him in January 2003. See Ex. 1 (B. Clark) at 205; Ex. 31 (Plaintiff's Response to Defendants' Second Set of Interrogatories), ¶ 13. Plaintiff, in fact, traveled to Florida to meet with Henry Baker, but the meeting did not take place, and Peter Baker later told plaintiff that his father had decided he would not lend money to plaintiff because he did not want to

---

Jurasek, in or about March 2002, plaintiff began considering relocating to Florida and going into business with his son and subsequently told coworkers and family members that it looked as if he would be leaving Crystal Rock by the end of the year. See id. at 115-16, 188, 191, 203. See also Ex. 6 (S. Clark) at 22 (plaintiff started to explore options in Florida after he "felt that Peter [Baker] didn't want him there . . . He had conversations with Peter that Peter didn't want him there."); Ex. 9 (Jurasek) at 66-67 (plaintiff first expressed a desire to move to Florida and open a restaurant to him after management offered him a severance package). Plaintiff also began training Gustafson to take over the HR function on or about June 1, 2002. See Ex. 8 (Gustafson) at 15-16.

[28] Plaintiff continued to experience hostility from upper management and, in May 2002, Jurasek admittedly "exploded" at plaintiff once again after plaintiff made the arrangements to have office chairs cleaned with Baker's approval. See Ex. 1 (B. Clark) at 224 (Jurasek disagreed with a decision to pay a contractor to clean the company's office chairs and yelled at plaintiff, who made the arrangements, even though Peter Baker had approved the cost); Ex. 9 (Jurasek) at 47-49 (testifying that he once again "exploded at Brian" because he didn't understand why he handled the situation the way that he did).; Ex. 20.

12

jeopardize their relationship.[29]

- After the proposal that Henry Baker lend him money fell through, plaintiff concluded and informed management that he did not "think [he] could afford to go" based on the proposed terms. See Ex. 1 (B. Clark) at 207-9. See also Ex. 3 (P. Baker) at 140. Management did not respond with an increased offer or express to plaintiff that he was welcome to stay, and plaintiff believed that management "thought [he] would just quietly go away." Ex. 1 (B. Clark) at 211.[30]

- Plaintiff retained counsel who sent a letter to Peter Baker, as President of Crystal Rock, on August 2, 2002 requesting to discuss plaintiff's situation and setting forth his concerns, *inter alia*, that he was being discriminated against on the basis of disability and/or age,[31] that he was being pressured

---

[29] See Ex. 1 (B. Clark) at 205-206. See also Ex. 2 (H. Baker) at 43-48 (testifying that he recalls one of his sons asking him if he would consider lending plaintiff money to purchase a restaurant, but that he ultimately decided it wasn't a good idea and that no one ever informed him that plaintiff was expecting to meet with him in Florida). A copy of the draft term sheet relating to the business plaintiff was interested in purchasing at the time is attached hereto as Exhibit 21. See Ex. 1 (B. Clark) at 284-87 (testifying that he considered purchasing a restaurant in Florida in June 2002, but that the deal did not go through at least in part because he did not receive funding from Henry Baker and his offer was too low).

[30] Plaintiff believed he was being forced out of the company because of his disability and/or age, but, as stated, did not want to retire from his career and did not think he could afford to leave based on the proposed terms and, therefore, decided to seek the advice of counsel. See Ex. 1 (B. Clark) at 207-10 ("I felt I was not able to satisfy my superiors in my job. I had had my bonus cut in half in November. I had had Peter constantly on me about problems with the phone system, and I had Dave Jurasek yelling at me, and I had had Peter in November say to me, you know, What do you think about retiring? We came to Florida in January to celebrate my sister's birthday, and we visited my in-laws, and I was troubled, and I told this series of events that occurred, and my father-in-law – I told my father-in-law, and he said that – you know, he said simply that, I think they want you gone. And I had a hard time believing that, but I also shared with my brother and brother-in-law in that same weekend the story. I wasn't one to talk about work to anybody, but they knew I was pretty troubled by what was going on by the way I thought I was being treated. And my father-in-law in the course of the conversation said he had some similar experience in a previous position, and he wished that he had sought counsel. And so he made a suggestion that I might consider that at some point. Take it up to a point in June or whenever, sometime after the last meeting with Peter when I thought that this is not going to go anywhere, that I believed that they thought I would just quietly go away, and I decided to seek the advice of counsel.").

[31] The letter also set forth plaintiff's concerns about the fact that the company had terminated the LTD insurance coverage covering employees without his knowledge and to his detriment. See Ex. 22. The

13

to leave and that he could not afford to retire on the terms that were being offered to him. See Ex. 22.[32]

- After receiving this letter, the company did not investigate plaintiff's claim that he was experiencing disability and age discrimination.[33] No one even spoke to plaintiff about his concerns

---

facts relating to the company's cancellation of the LTD policy are set forth *infra*, at Section III.D.1.

[32] In the letter, counsel set forth the facts leading plaintiff to believe that he was being treated unfairly and discriminated against in great detail. See id. The letter incorrectly describes the circumstances leading to plaintiff's transfer to the HR by stating that, when the sales department was reorganized, plaintiff "was not promoted or assigned to a comparable position in sales, but rather was offered the position of Human Resources manager and advised by Mike Dunn, the departing HR Manager, that he should accept the position because his job as Sales Manager would soon be eliminated." Id. As set forth *supra*, plaintiff, in fact, requested and was transferred to the HR position after being told by Dunn that management was planning to make a change in the sales department and that his future in the department was uncertain and Baker then appointed Woermer to assume plaintiff's previous responsibilities as Sales Manager without adding any additional upper level management staff to fulfill *Woermer's* prior functions in the department. Upon learning that she had incorrectly described these events in the letter, counsel for plaintiff immediately notified counsel for defendants of the misunderstanding and correction. See KE Aff., ¶ 2. See also Ex. 11 (Miller) at 82-83 (then counsel for defendants testifying that she does not recall whether plaintiff's counsel informed her of the misunderstanding).

[33] Rather, the company's management testified at deposition that a meeting between several members of management and counsel constituted the entirety of its "investigation" of plaintiff's discrimination claims and that they did not consider having an independent investigation performed even though plaintiff's claims involved actions taken by upper management including the President of the company. See Ex. 3 (P. Baker) at 160-61, 165-66, 205 (company looked into plaintiff's claims regarding the cancellation of the LTD insurance coverage, but only "talked amongst [them]selves as to the other claims" and did not perform any formal investigation). See also Ex. 2 (H. Baker) at 73; Ex. 9 (Jurasek) at 118-22 (only "investigation" of plaintiff's discrimination claims was meeting between counsel and upper management), 142-43; Ex. 30 (Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories), ¶14 (identifying all actions taken by defendants in response to plaintiff's complaints in the August 2, 2002 letter as: "Defendants . . . reviewed Plaintiff's complaints, consulted with an attorney, and asked that Plaintiff retract the charges he had made."). Defendants failed to investigate plaintiff's complaint even though well-established legal standards require that a company perform a good faith investigation of complaints of discrimination [see e.g., Dick v. Phone Directories Company, Inc., 397 F.3d 1256, 1269-70 (10th Cir.2005) ("Title VII imposes a duty on an employer to reasonably investigate and address a plaintiff's complaints [under Title VII]"); Malik v. Carrier Corp., 202 F.3d 97, 106 (2d Cir. 2000) ("an employer's investigation of a [] harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer.")] and Crystal Rock had a policy in effect at the time prohibiting harassment, including on the basis of disability and/or age, and requiring employees who felt that discrimination had taken place to

14

or the basis for his belief that he was being discriminated against.[34] In fact, after receiving the letter, Baker did not say anything to plaintiff about his claims except "You've made a big mistake." Ex. 1 (B. Clark) at 228.[35]

- On September 19, 2002, Crystal Rock notified plaintiff that his employment was being terminated in a letter sent by the company's attorney to plaintiff's counsel. See Ex. 24.[36] The letter begins with an unfounded accusation: "By way of [counsel's] August 2, 2002 letter to Peter Baker, [plaintiff], without any prior notice to [Vermont Pure Holdings] has demanded over $1 million to

---

"report this fact to their supervisor and/ro the President or C.E.O. immediately." See Ex. 15 at pp. 5, 9.

[34] See Ex. 3 (P. Baker) at 67-69, 157-61, 165-66, 168, 205. See also Ex. 4 (Berry) at 26-27, 33 (counsel for company admitting that no one requested to interview plaintiff with or without his counsel present); Ex. 7 (Fallon) at 53-54 (admitting that he never talked to plaintiff or designated anyone else to talk to plaintiff in order to investigate his claims of adverse treatment); Ex. 9 (Jurasek) at 135 (he did not speak with plaintiff about his perception that he was being discriminated against and he is not aware of anyone else who did).

[35] When Baker gave a copy of the letter to the company's CEO, Timothy Fallon, he told Fallon, contrary to undisputed fact, that it was *plaintiff* who had initiated the retirement discussions, and that plaintiff was merely unhappy with the amount of severance Crystal Rock had offered and made false allegations in the letter in an "off-the-charts grab for money." Ex. 7 (Fallon) at 39-44. See also Ex. 3 (P. Baker) at 118-20 (admitting that it was he who first suggested to plaintiff that he retire early). Fallon then contacted outside counsel for the company, Attorney Kevin Berry, chair of the commercial litigation department at Cozen & O'Conner in Philadelphia, Pennsylvania who had previously represented Fallon and Vermont Pure, Berry assigned responsibility for the matter to Attorney Melanie Miller, and discussions took place between counsel and upper management concerning how to respond to – rather than investigate – plaintiff's claims. See Ex. 3 (P. Baker) at 156-58, 193; Ex. 4 (Berry) at 7-12, 16-17; Ex. 11 (Miller) at 52-54.

[36] Counsel for Crystal Rock played an active part in the termination plaintiff's employment [compare Ex. 3 (P. Baker) at 193-94, 202, 224 with Ex. 7 (Fallon) at 75], even though they had merely accepted management's position that plaintiff's claims were false without performing any independent investigation of plaintiff's claims; outside counsel never requested to speak with plaintiff about his concerns or requested information from plaintiff to support his claims, other than a copy of the LTD Plan announcement, and, furthermore, failed to recommend that the company have an independent investigation performed despite the fact that plaintiff's claims involved upper management's actions and upper management were the sole source of their information. See Ex. 4 (Berry) at 25-27, 33-35; Ex. 11 (Miller) at 75-105, 191-92.

15

sever his employment with the company,"[37] inaccurately represents that the company "conducted a comprehensive investigation into Mr. Clark's claims" and that plaintiff "failed to document" the adverse treatment "[d]espite repeated requests," and then terminates plaintiff's employment on the basis that he "falsely claimed discrimination in an effort to coerce increased compensation and/or severance benefits." See id.[38]

---

[37] The August 2nd letter, in fact, makes no demand whatsoever. See Ex. 22. Rather it states plaintiff's concern that defendants were "pushing him to retire" because of his disability and/or age and then lays out *the damages he would suffer as a result of a premature termination of employment*; it also explicitly states that the purpose of the letter is to explain plaintiff's position concerning what has transpired "so that the issues that presently concern both Mr. Clark and Crystal Rock can be identified and addressed." See id.

[38] Management took the position that the concerns set forth on plaintiff's behalf in the August 2, 2002 letter were entirely false and that plaintiff made the claims in bad faith to try to extort a larger separation package from the company even though: 1) management and/or their counsel never spoke with plaintiff about the basis for his claims or conducted any independent investigation whatsoever to determine the validity of the claims, 2) management could not point to *any* material inaccuracies in the August 2nd letter, as set forth *infra*, 3) plaintiff had been a dedicated employee of the company for almost thirty years whom Henry Baker described as "loyal, and probably the best employee [Crystal Rock] had over the years," and 4) plaintiff had never given management any reason to question his veracity or truthfulness previously over that thirty year period. See Ex. 2 (H. Baker) at 15-16; Ex. 3 (P. Baker) at 161, 163-92, 209-11, 216; Ex. 7 (Fallon) at 43-58, 79-80, 84; Ex. 9 (Jurasek) at 36-43; Ex. 11 (Miller) at 191-92. Members of Crystal Rock management testified at deposition that two facts only, as stated in the August 2nd letter, were inaccurate – in particular, that plaintiff's Sales Manager position was not "eliminated" (but see n.32 *supra*, regarding counsel for plaintiff's immediate correction of the misstatement which was based on her misunderstanding of these events) and that plaintiff was not "advised by management that when an employee was no longer wanted at the company, the employee should not be terminated but rather should be subjected to working conditions that were so difficult or intolerable that the employee would choose to leave." See id. Although Crystal Rock management disputes that this practice occurred, they never questioned plaintiff about the basis for and/or investigated the claim, and plaintiff maintains that the claim is accurate. See Ex. 3 (P. Baker) at 172-74; Ex. 9 (Jurasek) at 37-38; Ex. 31 (Plaintiff's Response to Defendants' Third Set of Interrogatories), Nos. 2, 4, 6-8. Furthermore, defendants substantiated the only claim that plaintiff made in the August 2nd letter that they did investigate – *i.e.*, that Crystal Rock had terminated its LTD insurance coverage without notice to its employees. See Ex. 3 (P. Baker) at 160, 190. Initially, Crystal Rock disputed through counsel that the company ever provided such coverage, but when counsel for plaintiff provided a copy of the 1985 LTD Plan announcement [see Ex. 11 (Miller) at 218-19; Ex. 32], Crystal Rock management investigated plaintiff's claim and found that the company did, in fact, have an LTD Plan, but that it had canceled its LTD coverage in June 2000, as set forth *infra* at Section III.D.1. See Ex. 3 (P. Baker) at 190. In fact, management's sole basis for asserting that plaintiff's complaints were made in bad faith is that management purportedly did not share plaintiff's perception that

16

- When Baker handed plaintiff the termination letter, he informed plaintiff that he could continue to be employed if he would simply retract the discrimination and other claims made in the August 2nd letter even though plaintiff ostensibly had been terminated for cause by the company. See Ex. 1 (B. Clark) at 228; Ex. 3 (P. Baker) at 216-18; Ex. 25.[39] Plaintiff refused to do so because he had made the claims in good faith and believed they were true and no one had reassured him that management was not trying to force him out of the company and/or acknowledged or addressed plaintiff's concerns set forth in the letter in any way.[40] Defendants then terminated plaintiff's employment, effective September 30, 2002. See id.; Ex. 24.[41]

---

he was being discriminated against. See Ex. 3 (P. Baker) at 231-32 (testifying that the only basis for claiming that plaintiff's claims were made in bad faith is that he does not agree that plaintiff was being discriminated against); Ex. 9 (Jurasek) at 134-35 (management did not give any consideration to addressing plaintiff's perception that he was being discriminated against because it was his perception and not theirs), 212.

[39] Incredibly, although the letter states that plaintiff's employment is being terminated because he made false claims, in effect, to extort money from the company, Peter Baker and Crystal Rock's counsel testified at deposition that management did not intend to terminate plaintiff's employment by sending the letter but rather intended only to show plaintiff that the company meant business so that he would retract his claims. See Ex. 3 (P. Baker) at 217-19; Ex. 4 (Berry) at 42-45 (Crystal Rock management decided to deliver the termination letter and then ask plaintiff to recant certain claims and if he was willing then they would try to keep him in his job or to agree on a severance package); Ex. 11 (Miller) at 282-97 ("The plan was to put something in writing very strongly which says that [plaintiff] has materially misrepresented a lot in his letter" and the termination letter was written "in part" because "we wanted to bring [plaintiff] to the negotiating table with realistic expectations" and to try to resolve the situation without the involvement of lawyers).

[40] See Ex. 1 (B. Clark) at 228-29; Ex. 3 (P. Baker) at 216-18 (admitting that he told plaintiff that he could continue working at Crystal Rock if he would retract his claims in the August 2, 2002 letter and stating that he was not concerned that plaintiff would feel uncomfortable continuing to work at Crystal Rock because management had not acknowledged or addressed his claims of discrimination in any way). After plaintiff refused to retract his claims, Baker responded, "Then we're done." See Ex. 1 (B. Clark) at 228-29.

[41] After Crystal Rock terminated plaintiff's employment, he and his wife sold their house and moved to Sarasota, Florida. See Ex. 1 (B. Clark) at 118, 125. Plaintiff conducted an extensive but unsuccessful job search, and plaintiff and his wife ultimately purchased a luncheonette in or about May 2003, with the assistance of plaintiff's sister and brother-in-law. See id. at 118-22. Although the business

17

- Defendants selected Cheryl Gustafson, who was in her 30's, to fill the HR position; in fact, defendants had begun actively planning to replace plaintiff with Gustafson immediately after plaintiff told Peter Baker that he had "had it" in early 2002, if not sooner. See n.24 *supra*.

## III. ARGUMENT

### A. STANDARDS

In reviewing a motion for summary judgment, the "court must 'resolve all ambiguities and inferences . . . in the light most favorable to the party opposing the motion,' United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2d Cir.1982) (citations omitted), and may grant the motion only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(c)." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). See also Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir.1991). Defendants, as the moving parties, have the burden of demonstrating clearly the absence of any genuine issue of fact and showing their entitlement to a favorable determination under applicable principles of substantive law. See Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970). On summary judgment, the court must not try issues of fact; rather it must only determine whether there are such issues to be tried. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36-37 (2d Cir.1994). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the

---

of the luncheonette is improving, it has not yet begun to show a profit. See BC Aff., ¶ 10. After the prior settlement conference that was held in this case in July 2003, Crystal Rock offered plaintiff a job in a transparent attempt to limit its damage exposure. See Ex. 27; Ex. 28. The job offer was for a lesser position and at lower pay than the one he held when his employment was terminated and would have required plaintiff to move back to Connecticut and risk the total loss of the investment he had made in the luncheonette. See Ex. 1 (B. Clark) at 125-27; Ex. 27; Ex. 29; KE Aff., ¶ 1. Furthermore, defendants' offer called for plaintiff to report to his prior supervisor, Peter Baker, about whom he had complained without addressing or even acknowledging his concerns that he had been discriminated against in any way. See Ex. 27; Ex. 29. Plaintiff, therefore, rejected defendants' offer. See Ex. 29.

18

nonmoving party, summary judgment is improper." Id.

Furthermore, "in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment." Kerzer v. Kingly Manufacturing, 156 F.3d 396 (2d Cir.1998). "[S]ummary judgment is ordinarily inappropriate" in discrimination cases where intent and state of mind are in dispute. Carlton v. Mystic Transportation, 202 F.3d 129, 134 (2d Cir.2000).

### B. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISCRIMINATION CLAIMS

In support of summary judgment on plaintiff's discrimination claims, defendants contend that: 1) plaintiff cannot establish a prima facie case of discrimination and, even if he could, defendants had a legitimate business reason for terminating his employment and there is no evidence to support that that reason is pretextual [see Def.Mem. at 15-21]; 2) the evidence of discriminatory treatment is not sufficiently severe or pervasive to constitute a hostile work environment [see id. at 9-14]; and 3) there is no evidence that "any of the complained-of conduct" was directed against plaintiff because of his disability or age [see id. at 14-15]. Contrary to defendants' arguments, the evidence establishes that defendants subjected plaintiff to unlawful discrimination because of his disability and/or age.

#### 1. Standards

The Americans with Disabilities Act [ADA] makes it illegal for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge . . ., employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines "disability" as a "physical or mental impairment that substantially limits one more of the major life activities" of an individual. 42 U.S.C. §

19

12102(2). In addition to individuals who are currently disabled under the statute, the ADA protects individuals who are "regarded as" having such an impairment by their employer. See id. See also Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir.1997) ("[A]n individual is covered by the 'regarded as' prong . . . if he . . . is treated by a covered entity as having a substantially limiting impairment.). The determination of whether an employer perceived an employee as disabled "turns on the employer's perception of the employee," not whether the employee has a disability, and it is, therefore, "a question of intent." Colwell v. Suffolk County Police Dept., 158 F.3d 635, 646 (2d Cir.1998) (quoting Francis at 284) (quotations omitted).[42]

The Age Discrimination in Employment Act [ADEA] makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000). The ADEA protects employees who, like plaintiff, are at least 40 years of age. 29 U.S.C. § 631(a).[43]

---

[42] Defendants do not claim – for purposes of summary judgment – that plaintiff was not disabled or "regarded as" disabled under the ADA. See Def.Mem. at 19, n.5. As set forth in Section III.B.2. infra, the evidence in this case is more than sufficient to establish that defendants discriminated against plaintiff because they perceived him as disabled and/or because of his age.

[43] Plaintiff also asserts state law claims for disability and/or age discrimination under the Connecticut Fair Employment Practices Act [CFEPA] which makes it illegal for an employer to ". . . discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment" because of the individual's age or physical disability. C.G.S. § 46a-60(1). Connecticut courts "'review federal precedent concerning employment discrimination in enforcing [their] own antidiscrimination statutes.'" Ezikovich v. Connecticut Commission on Human Rights & Opportunities, 750 A.2d 494, 498, 57 Conn.App.767 (2000) (quoting Levy v. Commission on Human Rights & Opportunities, 671 A.2d 349, 236 Conn. 96 (1996)). See also Newtown v. Shell Oil Company, 52 F.Supp.2d 366, 374 (D.Conn. 1999). The CFEPA defines disability more broadly than the ADA, however, protecting individuals who have "*any* chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness . . ." C.G.S. § 46a-51(15) (emphasis added). The CFEPA does not contain specific language prohibiting discrimination against individuals who are perceived as disabled by their employers, and the Second Circuit

20

In order to establish a prima facie case of discrimination under the ADA, ADEA or CFEPA, a plaintiff must prove that: (1) he was within the protected group, (2) he was qualified for his position, (3) his employer subjected him to adverse employment action, and (4) the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 76 (2d Cir.2001); Heyman v. Queens Village Committee for Mental Health, 198 F.3d 68, 72 (2d Cir.1999); Millane v. Becton Dickinson & Co., 84 F.Supp.2d 282, 286-87 (D.Conn. 1999). "The burden upon the plaintiff to prove a prima facie case is minimal." Byrnie v. Town of Cromwell, 243 F.3d 93, 101, 102 (2d Cir.2001) (citing Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 134 (2d Cir.), cert. denied, 530 U.S. 1261 (2000); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir.1994)).

> Once a prima facie case has been established, the burden of production shifts to the employer who must defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment decision." Carlton, 202 F.3d at 134; Raskin v. Wyatt Co., 125 F.3d 55, 64 (2d Cir.1997). If the employer offers, via admissible evidence, a justification of its action which, if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination, then "'the *McDonnell Douglas* framework – with its presumptions and burdens' – disappear[s], and the sole remaining issue [is] 'discrimination *vel non*.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

Byrnie at 102. See also Carlton at 134-35.

Evidence establishing a prima facie case together with evidence tending to show that an

---

has held that the statute, therefore, does not protect such individuals. See Beason v. United Technology Corp., 337 F.3d 271, 279-81 (2d Cir. 2003). However, the Connecticut Supreme Court has upheld a determination by a Commission on Human Rights & Opportunities [CHRO] hearing officer finding discrimination on the basis of "physical disability *or* the perception of physical disability" and at least two Connecticut Superior Court decisions have explicitly found, contrary to Beason, that the CFEPA prohibits employers from discriminating against individuals on the basis of a perceived disability. See Ann Howard's Apricots Restaurant, Inc. v. CHRO, 237 Conn. 209, 216 (1996) (emphasis added); Mills v. Re/Max Heritage, 2005 WL 941400 (Conn.Super., March 16, 2005, Lewis, J.T.R.) (rejecting Second Circuit analysis in Beason); CHRO, ex rel. Samuel Tucker v. General Dynamics Corp., 1991 WL 258041, *4-6 (Conn.Super., Nov. 22, 1991, Axelrod, J.).

employer's proffered non-discriminatory explanation is false, without more, may be sufficient to establish discrimination in some cases. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-49 (2000); Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 381-83 (2d Cir.2001).[44] As stated by the Supreme Court in Reeves:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

Reeves at 147. See also James v. New York Racing Association, 233 F.3d 149, 156 (2d Cir.2000) ("The relevant factors identified by the Supreme Court 'include the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.'") (Quoting Reeves at 148-49). Ultimately, "[t]he task . . . is to examine the entire record and, in accordance with Reeves, make the case-specific assessment as to whether a finding of discrimination may reasonably be made." Zimmerman at 382 (2d Cir.2001).

Finally, the court should consider the *combined* impact of plaintiff's disability and age when considering whether defendants held a discriminatory motive in taking adverse employment action against plaintiff. See Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313 (3d Cir.2000) (recognizing that employee could establish that she was discriminated against on the basis of both her gender and race where employer did not discriminate on the basis of gender alone); Jefferies v. Harris County Community

---

[44] In Reeves, Justice Ginsberg in fact "expressed the view that 'circumstances in which plaintiffs will be required to submit evidence beyond' evidence establishing a prima facie case and evidence permitting a finding that a proffered explanation was false 'in order to survive a motion for judgment as a matter of law . . . will be uncommon.'" Zimmerman at 381 (quoting Reeves at 154 (Ginsber, J., concurring)).

Action Ass'n, 615 F.2d 1025, 1032-35 (5th Cir.1980) (district court erred in failing to consider plaintiff's claim of discrimination on the combined basis of both race and sex because "discrimination against black females can exist even in the absence of discrimination against black men or white women."). See also e.g., Farley v. Nationwide Mutual Insurance Company, 197 F.3d 1322 (11th Cir.1999) (verdict in favor of employee upheld on ADA and ADEA claims where jury found employer had terminated plaintiff's employment on the basis of both his disability *and* age); McCrory v. Kraft Food Ingredients, 98 F.3d 1342, 1996 WL 571146, *3 (6th Cir. 1996) (in order to survive summary judgment on federal disability and state law age discrimination claims, "[t]he plaintiff is required to produce evidence that either age or disability, or both, was a factor in the decision to fire and that 'but for' the discrimination, plaintiff would not have been fired.").

### 2. The evidence in this case establishes that defendants took adverse action against plaintiff because of his disability and/or age

As stated, defendants argue that plaintiff cannot establish a prima facie case of discrimination and, even if he could, defendants had a legitimate business reason for terminating his employment and there is no evidence to support that that reason is pretextual. See Def.Mem. at 15-21.[45] Contrary to defendants' argument, the evidence establishes that defendants discriminated against plaintiff because of his disability and/or age. Plaintiff was and had been viewed as a stellar employee by upper management until in or about 1998 when it became apparent that he had a disabling condition, at which point, management began to question his performance and to treat him adversely. Even though plaintiff was only 49 years old,

---

[45] Defendants do not contest, for purposes of their motion for summary judgment, that they are subject to the ADA, ADEA and CFEPA, that plaintiff is a protected individual under each of the respective statutes in that he was over the age of 40 and disabled or "regarded as" disabled or that plaintiff was qualified for his position. See Def.Mem. at 7-21. Therefore, the only aspect of plaintiff's prima facie case at issue is whether defendants subjected plaintiff to adverse action on the basis of his disability and/or age.

Peter Baker suggested that he "retire" because of his Parkinson's and his age. When plaintiff declined, Baker and Jurasek subjected plaintiff to a series of adverse actions, including cutting his bonus in half, publically berating him and letting him know that they were thinking of replacing him with as the head of HR. Then when plaintiff complained about their hostile and discriminatory treatment, his employment was abruptly terminated because of his disability and/or age and/or in retaliation for making good faith, reasonable claims of discrimination.

### a.    Discrimination on the basis of disability *and* age

Courts routinely find sufficient evidence to establish discrimination on the basis of disability *and* age under similar circumstances. For example, in Galambos v. Fairbanks Scales, 144 F.Supp.2d 1112 (E.D.Mo. 2000), the court denied summary judgment on plaintiff's federal disability and age discrimination claims based on evidence that plaintiff had performed his job satisfactorily for thirty years, but one month after suffering a heart attack, was told that "he was on the short list of people that [management] was looking to get rid of," subsequently placed on a performance improvement plan, and then discharged for alleged performance issues. Galambos at 1115-18. The court found, based on the evidence, that a factual issue existed concerning "whether [the employer] put [the plaintiff] on probation and promulgated [the performance improvement plan] in order to set him up for discharge" and that, under the circumstances, a reasonable jury could infer that "after [the plaintiff's] heart attack, which pointed up the physical vulnerability of [the] fifty-one year old employee, [the employer] created an opportunity to discharge the aging [plaintiff] and replace him with someone substantially younger." Id. at 1123-24, 1127 ("after [the plaintiff's] heart attack, [the employer's] perception of him changed from regarding him as a decent, reliable, long-term employee to regarding him as an employee who could not possibly perform adequately because he had suffered a heart attack.").

In another comparable case, McCrory v. Kraft Food Ingredients, 98 F.3d 1342, 1996 WL 571146 (6th Cir.1996), the court denied summary judgment on plaintiff's federal disability and state law age discrimination claims based on evidence presented by plaintiff, *inter alia*, that: 1) he began experiencing symptoms of anxiety and depression in March 1990, was admitted to the hospital after a severe crying spell at work in June 1990, and returned to work without restrictions in September 1990; 2) "[n]othing was said about his illness upon his return to work except for general inquiries about his health" and his performance remained satisfactory according to his year-end review, but in June 1991, after plaintiff requested permission to leave work early to see his psychiatrist, his supervisor inquired whether he had enough time with the company to take disability and retire; 3) plaintiff's supervisors then began to criticize his performance, told him they were "uncomfortable" with him talking to customers while he was on medication, put him on a performance improvement plan, again suggested he consider early retirement and, in August 1992, promoted a 25 year old employee to work together with plaintiff in an "unspecified" position, 4) one month later, the employer terminated plaintiff for alleged performance problems. Id. at *1-3. Plaintiff was 54 years old at the time and had been with the company for 32 years. Id. The court found the evidence sufficient to support that "plaintiff's supervisors may have been uncomfortable with [his anxiety and depression]" and that "compounded with his age, these improper motives may have constituted the real reasons for his discharge." Id. at *6. The court, therefore, denied summary judgment on plaintiff's disability and age discrimination claims.

As in Galambos and McCrory, and where, as here, the evidence supports that an employer is satisfied with an older employee's performance until the employee is diagnosed with or is perceived as having a disabling condition, and then begins to question the employee's ability to continue to perform at an acceptable level and criticizes his performance, pressures the employee to retire or simply terminates

25

his employment on the basis of alleged performance problems, courts routinely find sufficient evidence of discriminatory intent on the basis of disability and age. See also e.g., Phillips v. Reed's Supermarket, 1998 WL 527227 (N.D.Miss., July 24, 1998, Davidson, J.) (summary judgment denied on federal disability and age discrimination claims based on evidence that employer was satisfied with plaintiff's performance for 17 years, but then abruptly terminated his employment for alleged performance problems and replaced him with a substantially younger employee after plaintiff took a three week leave of absence for an undisclosed illness and appeared to have suffered a stroke due to sagging facial muscles and a slow, deliberate gate; court found direct evidence of disability discrimination based on manager's testimony that plaintiff's performance wasn't "up to par" after his leave of absence and that he felt plaintiff was no longer capable of performing his job because of his condition); Braverman v. Penobscot Shoe Company, 859 F.Supp. 596 (D.Maine 1994) (court denied summary judgment on plaintiff's federal disability and age discrimination claims based on evidence that management asked the plaintiff, a V.P. of Sales who was 64 years old and had been diagnosed with cancer, about his retirement plans on one occasion, suggested he retire when he informed management of his plans for radiation treatment, provided him with an unsolicited retirement information package, and then terminated his employment when he returned from medical leave on the alleged basis that he failed to keep management adequately informed about business-related matters). *Cf.* Keller v. Board of Educ. of the City of Albuquerque, 182 F.Supp.2d 1148 (D.N.M. 2001) (summary judgment denied on federal disability and age discrimination claims based on evidence, *inter alia*, that superintendent removed plaintiff from head HR position for alleged "political reasons," replaced her with a substantially younger candidate, relocated her to a sham position, and then, after plaintiff informed the superintendent that she had been diagnosed with breast cancer, responded that he knew many women who had died from the disease and that she would have to

resign or take a pay cut and subsequently reduced plaintiff's salary by 55% to a level lower than what she would receive if she retired, indicating that he perceived her as disabled and wanted to force her to resign).

### b. Disability discrimination

Courts also find sufficient evidence to support an independent claim for disability discrimination, in circumstances like those presented here, where after an employee was diagnosed with an illness or disabling condition, his employer lost confidence in his ability to continue to perform his job functions satisfactorily and pressured the employee to resign or terminated his employment on pretextual grounds.

For example, in Equal Employment Opportunity Commission v. R.J. Gallagher Company, 181 F.3d 645 (5th Cir.1999), the court reversed summary judgment in favor of the employer on plaintiff's ADA claim based on evidence that the employer perceived plaintiff as disabled due to his cancer diagnosis and, therefore, unable to continue to perform his functions as company president. See R.J. Gallagher at 656-57. Plaintiff presented evidence that he had worked successfully for the defendant for over twenty years but then began to suffer from noticeable health problems in late 1993 and was diagnosed with cancer. Immediately after plaintiff returned to work from medical leave, his employer expressed doubts about his ability to continue to perform his job functions and suggested he retire. When plaintiff responded that he intended to keep working until age sixty-five, his employer demoted him and cut his compensation in half on the basis of alleged poor performance. Id. at 648-49.

Likewise, in Cinelli v. U.S. Energy Partners, 77 F.Supp.2d 566 (D.N.J. 1999), the court denied summary judgment on plaintiff's ADA claim based on evidence that the employer began to treat the plaintiff unfavorably after a lump in his neck became noticeable, criticizing his alleged poor sales results and imposing a sales quota, and, after plaintiff disclosed that he had terminal cancer, expressed doubts

27

about his ability to meet the quota and then terminated his employment. See Cinelli at 570-71. Under these circumstances, where the employer had an unsupported "rapid and conclusive loss of confidence in [plaintiff's] ability to complete his work" after plaintiff's health problems became apparent, the court found a genuine issue of material fact as to whether the employer "felt that [the plaintiff] was unable to do his job because of his cancer." Id. at 575-76. See also e.g., Brown v. Lester E. Cox Medical Centers, 286 F.3d 1040, 1045 (8th Cir.2002) (verdict for employee on ADA claim upheld based on evidence that hospital officials perceived nurse with multiple sclerosis as disabled and unfit to perform surgical room responsibilities because of her diagnosis, reassigned her to work in supply room and then told her she would have to find another job for alleged "health reasons").

### c.   Age discrimination

Similarly, in comparable age discrimination cases, when the evidence supports that an employer believes an employee is no longer capable of performing "up to par" because of the employee's *age* and makes efforts to get the employee to retire or terminates the employee for alleged poor performance, courts also routinely find sufficient evidence of discriminatory animus.[46]

For example, in Carlton v. Mystic Transportation, Inc., 202 F.3d 129 (2d Cir.2000), *cert. denied*, 530 U.S. 1261 (2000), the Second Circuit reversed summary judgment for the employer on the plaintiff's

---

[46] Plaintiff's claim that he was discriminated against on the basis of age is based, *inter alia*, on the evidence that even though plaintiff had been a superior performer throughout his, at the time, 25 year tenure with the company, management began to question his ability to perform after he developed visible tremors and started to look older, that he was excluded from the merger planning process although the younger managers were included, that he transferred from sales to HR because he was led to believe that his position in sales was insecure and then was replaced by a younger employee, John Woermer, in sales, that he was overburdened and given virtually no help in HR, that Peter Baker suggested that plaintiff retire, in part, because of his age which was then 49 and that, after he indicated that he did not want to retire, his bonus was cut in half, he was publicly yelled at, told that he might be replaced as the head of HR and then terminated when he complained that he thought he was being discriminated against. He was then replaced in HR by another employee with no background in HR who was in her 30's.

age discrimination claim based on evidence that the employer discharged the plaintiff, who was a 57 year old director of marketing, without cause, and suggested to him during the termination meeting that he should retire, and then appointed a 31 year old employee to fill his position. See Carlton at 135-37. The court found sufficient evidence that the employer's proffered legitimate, non-discriminatory explanations for Carlton's discharge – a reduction in force and poor performance – were pretextual given that the younger employee was ultimately hired to replace him and based on the lack of documentation to support his alleged performance problems and gave particular import to management's suggestion that plaintiff retire, stating "[a]lthough evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of all the evidence." Id. at 136-37 (objective evidence indicated that plaintiff was performing adequately because, while management claimed to be unhappy with his performance for years, they continued to employ him and he had "never received a negative written performance evaluation or formal warning, nor [was] there any writing whatsoever criticizing his job performance, indicating that as a reason for his firing poor job performance was an afterthought.") (quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.1998)).

Likewise, in Acrey v. American Sheep Industry, 981 F.2d 1569 (10th Cir.1992), the court upheld a finding of age discrimination based on evidence that the employer believed the 50 year old plaintiff would not be capable of handling her position's increased responsibilities post-merger with another company at least in part because of her age and set her up to fail in the position in an effort to get her to resign or to have a basis for terminating her employment. See Acrey at 1572-73 (plaintiff presented evidence that management excluded her from merger planning, failed to provide her with necessary training on the new accounting system, and criticized her performance "communicating in both words and deeds that her