Claim) and failure to provide requested documents (Sixth Claim), but not the claims based on technical violations (Second Claim), promissory estoppel (Third Claim) and failure to pay severance benefits (Fifth Claim).[56]

Plaintiff, thus, claims that defendants 1) either *did not terminate*[57] the LTD Plan or breached their fiduciary duties by terminating the Plan without authority, 2) terminated plaintiff's employment to prevent him from attaining his right to benefits under the LTD Plan, and 3) refused to provide plaintiff with Plan documents.

### 1.    Facts pertaining to plaintiff's ERISA claims

In 1985, Crystal Rock announced that it had adopted a long term disability plan [the LTD Plan] for the benefit of its employees that would provide income in the amount of 60% of salary to a maximum of $5,000 per month in the event an employee became disabled from work.  See Ex. 32.  The announcement was the only communication issued by Crystal Rock to its employees concerning the terms of the LTD Plan.  See Ex. 2 (H. Baker) at 61.[58]  The announcement did not state that Crystal Rock could or might terminate the LTD Plan.  To the contrary, the announcement informed the employees that they could count on continued LTD coverage under the Plan:

---

[56] The arguments defendants assert concerning plaintiff's Second, Third and Fifth Claims for Relief, therefore, are not addressed herein.

[57] Plaintiff learned for the first time in discovery that defendants terminated the LTD insurance covering their employees, including plaintiff, by mistake and, in fact, had no intention at any time to terminate the employees' LTD Plan.  As set forth herein, this admission establishes either that the Plan was not terminated at all or, at the very least, that it was terminated without proper authority.

[58] Plaintiff requested, but defendants have not produced and management testified at deposition that they are not aware of any summary plan description or documents other than the April 1985 announcement that existed reflecting the terms of the Plan at the time it was adopted.  See Ex. 1 (H. Baker) at 59, 61; Ex. 3 (P. Baker) at 80 (stating that he has "no idea" concerning what, if any, communications were made to employees about the Plan other than the April 1985 announcement and does not recall whether there was any summary plan description created or provided to employees).

49

This new benefit may not seem important to you now as you enjoy good health; and pray that you never have to take advantage of the plan, but (as life insurance salesmen like to say) "God Forbid" a catastrophe should occur in your life . . . it is comforting to know that you will still be able to keep up the payments on the car, or house or condo . . .

Ex. 32.

In 1995, plaintiff bought individual LTD coverage to supplement the coverage provided under the Crystal Rock LTD Plan.  See Ex. 1 (B. Clark) at 246, 250-51.[59]  In or about July 2000, when plaintiff was being trained for the HR position, he inadvertently learned that the company's LTD insurance had been terminated when Dunn informed him that he no longer needed to have new employees fill out the insurance company's enrollment form for the LTD coverage.  See Ex. 3 (B. Clark) at 245-47.[60]  When plaintiff discovered that Crystal Rock had terminated its LTD insurance coverage, he was no longer able to purchase LTD insurance because of his Parkinson's diagnosis and, as a result, was unable to obtain insurance to replace the Crystal Rock LTD coverage.  See Ex. 1 (B. Clark) at 245-46, 253-54.  The amount of supplemental LTD coverage plaintiff purchased in 1995 was determined by the amount of coverage he had under the Crystal Rock LTD Plan.  See Declaration of Daniel Green dated February 16, 2005, submitted in conjunction with Def.Mem., Ex. E.  After Dunn told plaintiff that the company no longer had the LTD coverage, he exercised his option to increase his supplemental coverage to the extent possible.  See Ex. 1 (B. Clark) at 251-53.

In discovery, plaintiff learned for the first time that Crystal Rock canceled the LTD insurance it

---

[59] Plaintiff's income was rising in 1995 and he was concerned about providing for his family should anything happen to him.  See Ex. 1 (B. Clark) at 250-51.

[60] Dunn had written to Unum, the company's LTD insurance carrier, on or about June 28, 2000, to terminate the LTD insurance policy effective July 31, 2000, explaining "Crystal Rock has recently been acquired and will assume the benefit plans of [the] new company."  Ex. 36.

had covering its employees *by mistake*. See Ex. 3 (P. Baker) at 89.[61] According to Peter Baker, management decided to cancel the LTD insurance covering the *officers of the company only* because a fund was allocated as part of the merger to allow officers to purchase individual LTD coverage. See Ex. 3 (P. Baker) at 85-87. According to Baker, Michael Dunn, who was charged with the responsibility of communicating with the LTD insurance carrier, misunderstood management's direction and, by mistake, canceled the LTD insurance policy covering the employees as well as the policy covering the officers. See id. at 85-87, 89. The fact that the employees' LTD insurance was canceled by mistake is not in question although the cause of the mistake may be. Thus, Dave Jurasek, the company's Controller, testified that he, not Dunn, made the mistake because he instructed Dunn to cancel the company's LTD policy under the mistaken belief that the policy covered the officers and Controller of the company only. See Ex. 9 (Jurasek) at 97, 88-104, 113.[62]

When plaintiff's counsel sent the August 2, 2002 letter complaining that the company had canceled its LTD coverage in violation of ERISA and then provided defendants' counsel with a copy of the LTD Plan announcement, defendants apparently discovered for the first time that they had canceled the employees' LTD insurance coverage by mistake in June 2000. See Ex. 9 (Jurasek) at 114. After learning of the mistake in August 2002, the company immediately inquired about reinstating the insurance coverage. See Ex. 37. However, the company did not obtain a new LTD insurance policy covering the

---

[61] As discussed *infra*, the fact that Crystal Rock canceled its LTD insurance policy does not mean that it terminated its LTD Plan.

[62] Dunn, who no longer works for the company, testified at deposition that he was aware, when he canceled the LTD insurance, that the policy covered both the officers and the employees. See Ex. 6 (Dunn) at 39-40. He also testified that, to his recollection, "there wasn't a similar policy with Vermont Pure, and that was a leveling of the benefits or an equaling of the benefits between the two companies as far as the potential merger." Id. at 36.

employees until the fall of 2004. See Ex. 2 (H. Baker) at 68. At present, the company has an insurance policy covering the benefits it provides under the LTD Plan to its employees. See id.

Even though the company terminated the LTD *insurance coverage* in 2000, it never terminated the LTD *Plan* promising LTD benefits to the Crystal Rock employees. See Ex. 3 (P. Baker) at 86-87, 89.[63] When the LTD Plan was adopted in 1985, Crystal Rock insured the benefits under a policy with Mutual Benefit Life Insurance Company [Mutual Benefit]. See Affidavit of Sharon Miller dated April 6, 2005 [Miller Aff.], submitted in conjunction with Def.Mem., ¶ 5. In 1991, Crystal Rock purchased a policy with Paul Revere Life Insurance Company [Paul Revere] to insure the LTD benefits under the Plan and canceled the policy with Mutual Benefit. See id.; Loftus Aff., ¶¶ 4-5. It is plaintiff's position that when the company canceled the Unum [f/k/a Paul Revere] LTD insurance policy in June 2000 [see Ex. 36], it became self-insured and remained self-insured until it purchased new insurance in the fall of 2004.

In follow up to her August 2, 2002 letter raising, *inter alia*, the concern that Crystal Rock had canceled its LTD coverage or Plan in violation of ERISA, plaintiff's attorney wrote on September 6, 2002 to defendants' attorney to request copies of any summary plan descriptions [SPDs] and notices issued for the LTD Plan. See Ex. 23.[64] Defendants, through counsel, responded to plaintiff's September

---

[63] Defendants cite Paragraph 12 of Timothy Loftus' Affidavit as the basis for their claim that defendants terminated the LTD *Plan*, as well as the LTD insurance policy. This paragraph of Loftus' affidavit is not based on the affiant's personal knowledge and has no factual support. See Affidavit of Timothy Loftus dated February 10, 2005 [Loftus Aff.], submitted in conjunction with Def.Mem., ¶ 12. As to Unum terminating the *insurance policy*. See Ex. 10 (Loftus) at 35-36; Ex. 36. The fact that Crystal Rock terminated its LTD insurance coverage does not mean that it terminated its LTD Plan. See Ex. 10 (Loftus) at 14-15, 41-44 (disability benefits director at UnumProvident testifying that a LTD plan is distinguishable from a LTD policy in that a company may adopt a plan and then insure it through one or more policies and/or self-insure the plan and, therefore, that an insurance policy may be terminated without affecting an employee's entitlement to benefits under an employee benefit plan).

[64] As noted above, plaintiff had only been told by Dunn that it was no longer necessary to fill out the LTD insurance enrollment forms because the insurance had been canceled. See Ex. 1 (B. Clark) at

6th request for LTD Plan documents in the September 19th letter terminating plaintiff's employment. See Ex. 24. Defendants flatly refused to provide the requested documents and dismissed plaintiff's complaint that the company had terminated the LTD coverage in violation of ERISA, stating:

> Vermont Pure will not respond to your September 6, 2002 request for "a copy of every summary plan description and notice issued concerning any modification and/or termination of the Long Term Disability coverage provided by Crystal Rock Water Co. to its employees commencing in or about 1985." Employee notice is irrelevant given Mr. Clark's actual knowledge [that the LTD insurance had been terminated] and fiduciary status.

Ex. 24.[65]

Despite the dismissive tone of the September 19th letter, defendant's counsel has admitted that she believed at the time plaintiff's employment was terminated that his ERISA claim was "worrisome" and an "area of potential liability." Ex. 11 (Miller) at 307.[66] Defendants had just become aware in August 2002 when plaintiff complained that the company's LTD coverage had been terminated in violation of ERISA that they had mistakenly canceled their LTD insurance coverage two years before and were then self-insured for LTD benefits. Likewise, defendants were aware that plaintiff had a progressive and potentially disabling disease. By terminating plaintiff's employment before he became disabled from work, defendants avoided the necessity of buying replacement LTD coverage and/or the real likelihood of having to pay plaintiff his LTD benefits.

---

103, 244-45. When plaintiff asked Dunn for an explanation, he did not respond. See id. at 245. Neither plaintiff, nor counsel knew that the Plan had not been terminated and that the insurance coverage has been terminated by mistake.

[65] Incredibly, defendants' counsel refused plaintiff's request under ERISA for the LTD SPD's, in part, based on the legally insupportable assertion that plaintiff, who had no discretionary authority or control with respect to the Plan, was "a 'fiduciary' of the Plan as that term is defined by ERISA." See id.; 29 U.S.C. § 1002 (21)(A).

[66] It is difficult to understand how defendants can credibly contend that the claims plaintiff made in the August 2nd letter were false or that plaintiff's claims were not made in good faith in light of this admission by defendants' counsel.

53

**2.     Defendants either did not, in fact, terminate the LTD Plan or terminated the Plan, by mistake, in breach of their fiduciary duties under ERISA**

Defendants argue in support of summary judgment on plaintiff's breach of fiduciary duties claim [First Claim] that Crystal Rock was "free to terminate its LTD Plan and did so in accordance with its terms." Def.Mem. at 25. Defendants argue in addition that plaintiff cannot show that he suffered harm as the result of the claimed breach of fiduciary duties. See Def.Mem. at 28-29.

Plaintiff disputes defendants' argument that the company was free to terminate the Plan and did so in accordance with its terms, in the first instance, because the argument rests on an incorrect factual premise – *i.e.*, that the *insurance policy* Crystal Rock purchased to provide the LTD benefits was the *Plan*.

Defendants illogically claim that documents that were not in effect and did not even exist in 1985 when Crystal Rock adopted the LTD Plan – specifically, a Paul Revere group insurance policy issued to Crystal Rock in 1991 and later terminated by the company effective July 31, 2000 and the benefit summaries relating to that policy – constitute "the LTD Plan." See Def.Mem. at 26. Defendants ignore the fact that there is a distinction between an employee benefit *plan* adopted by a company to provide benefits to its employees, insured either by one or more commercial insurance policies and/or self-insured by the company, and an *insurance policy* issued by an insurance company to provide benefits promised by an employer under such a plan. ERISA, 29 U.S.C. § 1002 (1), recognizes this distinction:

> The terms "employee welfare benefit *plan*" and "welfare *plan*" mean any *plan*, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . to the extent that such *plan*, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, *through the purchase of insurance or otherwise*, (A) . . . benefits in the event of . . . disability . . .

(italics added). See Ex. 10 (Loftus) at 14-15, 41-44 (disability benefits director at UnumProvident

54

testifying that a LTD plan is different from a LTD policy in that a company may adopt a plan and then insure it through one or more policies and/or self-insure the plan and, therefore, that an insurance policy may be terminated without affecting an employee's entitlement to benefits under an employee benefit plan).

Defendants apparently claim that Crystal Rock's mistaken cancellation of the Unum/Paul Revere insurance policy covering its employees effected a termination of the LTD Plan. However, the cancellation in 1991 of the LTD insurance policy that Crystal Rock had with Mutual Benefit from the inception of the Plan in 1985 did not terminate the Plan. Moreover, in further contradiction of defendants' position that the Paul Revere insurance policy is the LTD Plan, defendants have purposefully avoided the claim that the Mutual Benefit policy that was in effect prior to the Paul Revere policy was the LTD Plan inasmuch as the Mutual Benefit policy contained conversion rights which defendants explicitly claim the Plan does not have.[67]

In fact, contrary to defendants' argument, Crystal Rock's LTD Plan consists of the 1985 announcement describing the terms of the Plan to Crystal Rock's employees. Unlike the Paul Revere policy, the announcement was both *in existence* at the time the LTD Plan was adopted by the company and distributed to employees in order to explain the terms of the Plan. See Feifer v. Prudential Life

---

[67] The Affidavit of Sharon Miller, submitted in conjunction with defendants' memorandum, attests to the fact that Mutual Benefit "provided group LTD coverage for [Crystal Rock] . . . from 1985 through 1991" and attaches a Schedule of Insurance relating to that policy. See Miller Aff., ¶¶ 3-7. According to the Schedule of Insurance, the policy issued by Mutual Benefit and, thus, the original policy providing benefits to employees following the announcement of the company's LTD Plan, contained conversion rights which seemingly would have allowed a participant to convert to private LTD insurance coverage upon termination of the group policy *even if* the participant had a disabling disease while the replacement policy issued by Paul Revere did not contain any such conversion rights. See Mutual Benefits Schedule of Insurance attached to Miller Aff., Bates #PRLMS00346; Ex. 10 (Loftus) at 23-28 (testifying that while original Mutual Benefit policy had conversion rights, the Paul Revere policy did not even though Crystal Rock's application for Paul Revere benefits was for replacement coverage and did not indicate that any change was to be made to the existing coverage). See also Ex. 35; Loftus Aff., ¶13.

Insurance Company of America, 306 F.3d 1202, 1208-10 (2d Cir. 2002) (treating program summary distributed to employees as the "plan" under ERISA because it was the only written document that *existed* describing the employee benefits at the time).  See also Ex. 2 (H. Baker) at 59, 61; Ex. 3 (P. Baker) at 80 (stating that he has "no idea" concerning what, if any, communications were made to employees about the Plan other than the April 1985 announcement and does not recall whether any summary plan description was created or provided to employees).[68]

The evidence, thus, establishes that the Crystal Rock LTD Plan has never been terminated although the LTD insurance coverage Crystal Rock had with Unum/Paul Revere was mistakenly canceled effective July 31, 2000 when defendants canceled the LTD insurance covering the company's officers.  In fact, defendants' intention in cancelling the insurance coverage for the officers was *not* to terminate their LTD benefits, but rather to replace their group coverage with individual policies.  See Ex. 3 (P. Baker) at 85-87.  As Peter Baker testified, Crystal Rock canceled the Paul Revere policy covering employees accidentally.  See id. at 85-87, 89.  According to Baker, the company never made a decision to cancel the employees' LTD group insurance coverage and, *ipso facto*, certainly did not decide to terminate the LTD Plan for its employees.  See id. at 89.  Thus, the LTD *Plan* promising LTD benefits to the Crystal Rock employees was never terminated by the company.[69]

Alternatively, accepting *arguendo* that defendants terminated the Crystal Rock LTD Plan when

---

[68]  While defendants claim that the replacement policy issued by Paul Revere constituted Crystal Rock's LTD Plan, defendants, as stated, do *not* claim that the Mutual Benefit policy originally issued to provide LTD coverage to its employees constituted all or any part of the Plan.  See Def.Mem. at 26; Def.Supp.Mem. at 2.

[69]  During the period between June 2000, when the Unum/Paul Revere policy was mistakenly canceled, and the fall of 2004, when the company again purchased LTD insurance coverage, the company was self-insured.

the company mistakenly canceled the Unum/Paul Revere LTD policy, the termination was accidental and, thus, certainly not authorized under the Plan. In Biggers v. Wittek Industries, Incorporated, 4 F.3d 291 (4th Cir. 1993), the court upheld judgment in favor of plan beneficiaries who sought benefits under a severance plan which the employer claimed had been amended. The court held that the plan had not been amended because, while the employer may have intended to amend and had even prepared a written amendment of the plan, the company president had not signed the amendment before the plaintiff employees were terminated.

> [W]e hold that in the absence of provisions in a plan that provide procedures for amendment, a writing amends a plan only when accompanied by a clear manifestation of an intent to alter the policy or plan. A rule that would establish otherwise would expose companies to unpredictable consequences whenever they undertook a review of existing policies.

Id. at 296.

The Plan, as set forth in the 1985 announcement, does not contain a provision that authorizes or establishes procedures for terminating the Plan.[70] To the contrary, the announcement informs the employees that the Plan will continue to protect them in the future by providing benefits that are not needed "now" but will be if "a catastrophe should occur in your life." Ex. 32. Even if a right to terminate the Plan may be inferred here despite the promise of vested benefits that is implied in the Plan announcement [see Ex. 32], the right to terminate must at the very least require that the Plan be terminated on purpose.

---

[70] Defendants argue that the fact that Crystal Rock was authorized under the Paul Revere policy to cancel its insurance coverage satisfies amendment procedure requirement. See Def.Mem. at 26. This argument is baseless. Both the Mutual Benefit and the Unum/Paul Revere insurance policies provide for the cancellation of the *policy* but not for the termination of the *Plan*. See Ex. 34; Miller Aff., ¶¶ 7-8. In this regard, both policies also provide that an employee's coverage under the policy will terminate, *inter alia*, upon cancellation of the policy. See id. And, in fact, the employees' coverage under the Mutual Benefit policy did terminate in 1991 when Crystal Rock purchased a LTD insurance policy with Paul Revere and canceled the Mutual Benefit policy. See Miller Aff., ¶ 5; Loftus Aff., ¶ 5.

ERISA requires, in pertinent part, that a fiduciary:

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – . . . (A) for the exclusive purpose of : (I) providing benefits to participants . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter [Subchapter I – Protection of Employee Benefit Rights; 29 U.S.C. §§ 1001-1191c] . . .

29 U.S.C. §1104(a).

The Second Circuit has restated these fiduciary requirements as follows:

> A fiduciary must discharge his duties solely in the interests of the participants and beneficiaries. He must do this for the exclusive purpose of providing benefits to them. And he must comply with the care, skill, prudence, and diligence under the circumstances then prevailing of the traditional prudent man. . . . An employer has a duty to deal fairly and honestly with its beneficiaries.

Abbruscato v. Empire Blue Cross and Blue Shield, 274 F.3d 90, 102 (2d Cir. 2001) (citations and quotations omitted).

Defendants, thus, breached their fiduciary duties by accidentally terminating the LTD Plan. See Inter-Modal Rail Employees Association v. Atchison, Topeka and Santa Fe Railway Company, 520 U.S. 510, 515-16 (1997) ("An employer may, of course, retain the unfettered right to alter its promises, but to do so it must follow the formal procedures set forth in the plan."); Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995) (Court noted that, where company amends or terminates a welfare benefit plan, "only cognizable claim [for breach of fiduciary duties under ERISA] is that the company did not do so in a permissible manner").

Furthermore, the 1985 Plan announcement may reasonably be interpreted as promising vested benefits. Consequently, defendants had no authority in any case to terminate the LTD Plan. As stated in

<u>Schonholz v. Long Island Jewish Medical Center</u>, 87 F.3d 72 (2d Cir. 1996), "[n]othing in ERISA []

forbids or prevents an employer from agreeing to vest employee welfare benefits or from waiving its

ability to terminate or amend unilaterally a plan, and several of our sister circuits have held that such

agreements or waivers will be enforced." <u>Schonholz</u> at 76. Thus, while employers are generally free

under ERISA to terminate an employee welfare plan at any time, an employer may not do so when it has

promised vested benefits.  See <u>Abbruscato</u>, 274 F.3d at 96-97; <u>In re Unisys Corp. Retiree Medical

Benefit "ERISA" Litigation</u>, 57 F.3d 1255, 1263-64 (3d Cir. 1995); <u>Devlin v. Empire Blue Cross and

Blue Shield</u>, 274 F.3d. 76, 88-89 (2d Cir. 2001) (summary judgment reversed on breach of fiduciary

claim; employer may have violated fiduciary duties to employees by promising lifetime benefits and then

subsequently terminating benefits, indicating that in the Second Circuit, where plaintiff can point to

"written language capable of reasonably being interpreted as creating a promise on the part of [the

employer] to vest [the recipient's] . . . benefits," summary judgment must be denied); <u>Schonholz</u> at 77-78

(indicating that commitment to vest need not be in "precise language denying the right to withdraw

benefits" and that it is sufficient that employee can "point to written language capable of reasonably being

interpreted as creating a promise").

     In addition, the LTD Plan announcement did not inform the employees that the company retained

the right to terminate or amend the Plan.  <u>Contrast</u> <u>Joyce v. Curtiss-Wright Corporation</u>, 171 F.3d 130,

136 (2d Cir. 1999) (where SPD contained reservation of rights clause, ambiguous language possibly

promising vested benefits not sufficient to vest benefits); <u>American Federation of Grain Millers, AFL-

CIO</u>, 116 F.3d 976, 982 (2d Cir. 1997) (a reservation of rights clause in the SPD supercedes ambiguous

language that can be interpreted to promise vested benefits).

     Finally, defendants argue that plaintiff cannot establish that defendants' breach of fiduciary duties

59

caused him damage because he is not yet disabled.  See Def.Mem. at 28.  Contrary to defendants'

argument, plaintiff has suffered damage because he has a progressively disabling health condition and

lacks adequate LTD insurance coverage.  This loss of coverage is an actionable harm.  See Varity

Corporation v. Howe, 516 U.S. 489, 507-15 (1996) (where breach of fiduciary duty resulted in

employees' loss of coverage under non-vested employee welfare benefit plans, reinstatement of

employees' coverage under the welfare benefit plans is appropriate equitable relief under ERISA);

contrast Tardif v. General Electric Co., 2000 WL 33376644 (D. Conn 2000) (breach of fiduciary duty

claim fails where plaintiff cannot harm resulting from the breach because plaintiff did not qualify for

coverage and, thus, benefits under the plan).

    In order to remedy the loss of his LTD coverage, plaintiff seeks appropriate equitable relief under

ERISA, including an order reinstating plaintiff's employment and his coverage under the LTD Plan.

### 3.    Defendants terminated plaintiff's employment in violation of § 510 of ERISA, 29 U.S.C. § 1140

Defendants seek summary judgment on plaintiff's § 510[71] wrongful termination claim on the basis

that there is "no evidence" that supports his contention that defendants terminated his employment, at

least in part, to deprive him of his ERISA rights to coverage and/or benefits under the LTD Plan.[72]  See

---

[71] ERISA §510 provides, in pertinent part, that:

> It shall be unlawful for any person to discharge . . . .a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter [Subchapter I – Protection of Employee Benefit Rights, 29 U.S.C. §§ 1001-1191c] . . . , or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan [or] this subchapter. . . .  The provisions of section 1132 of this title shall be applicable to the enforcement of this section.

29 U.S.C. § 1140.

[72] Defendants also argue that there is no evidence to support a claim that plaintiff does not make – i.e., that defendants terminated the LTD Plan in order to avoid paying him benefits.  See Def.Mem. at 38.

Def.Mem. 37-38.  In making this argument, defendants ignore the evidence.  In fact, substantial evidence supports plaintiff's claim, including, *inter alia*, 1) defendants were aware that plaintiff was visibly ill and diagnosed in December 1999 with a progressive disease that was likely to become disabling; 2) defendants canceled their LTD insurance coverage by mistake in June 2000 and were not aware that they had done so until August 2, 2002 when plaintiff, through counsel, wrote to complain that they had terminated the company's LTD coverage in violation of ERISA; 3) after receiving the August 2nd letter, defendants looked into the possibility of reinstating the LTD insurance coverage that they had mistakenly canceled but did not do so until the fall of 2004; 4) defendants' attorney believed that the ERISA claims made in counsel's August 2nd letter were "worrisome" and "had merit"; 5) soon after plaintiff complained in August 2002 about the termination of the LTD coverage and almost immediately after plaintiff's counsel requested, by letter, dated September 6, 2002, that defendants provide copies of LTD Plan documents, defendants terminated plaintiff's employment by letter, dated September 19, 2002;  6) in the September 19th letter, defendants responded to plaintiff's claims by refusing to provide the requested documents and summarily dismissing his concerns without informing him that the LTD coverage had been canceled by mistake; 7) after giving plaintiff the September 19th termination letter, defendants informed plaintiff that he could keep his job if he would withdraw the complaints he made in the August 2nd letter.  By terminating plaintiff's employment, defendants avoided the expense of purchasing replacement insurance to cover the employees' LTD benefits and/or of self-insuring the LTD coverage provided under the LTD Plan.  Likewise, by terminating plaintiff's employment, defendants prevented

---

Since plaintiff does not claim that defendants terminated the LTD Plan to prevent him from obtaining benefits, plaintiff does not respond to this argument herein.

plaintiff from obtaining or pursuing coverage, as an employee, under defendants' LTD Plan.[73]  Substantial evidence, thus, supports plaintiff's claim that defendants were, in part, motivated to terminate plaintiff's employment by the desire to prevent plaintiff from obtaining coverage under the company's LTD Plan.

Section 510 protects an employee from being terminated because an employer is seeking to avoid providing benefits that it has promised.  See Ingersoll-Rand Company v. McClendon, 498 U.S. 133, 143 (1990).  Rights to both vested and unvested employee benefits are explicitly protected under §510 which "makes it unlawful to 'discharge . . . a [plan] participant or beneficiary . . . for the purpose of interfering with the *attainment of any right* to which such participant may become entitled under *the plan*. 29 U.S.C. §1140 (emphasis added).'"  Inter-Modal Rail Employees Association v. Atchison, Topeka and Santa Fe Railway Company, 520 U.S. 510, 514 (1997).  Even though an employer has the right in some circumstances unilaterally to terminate or amend a welfare benefit plan, the plain language of §510 "draws no distinction between those rights that "vest" under ERISA and those that do not."  Id. at 515.[74]

The McDonnell Douglas burden-shifting proof framework applies to claims brought under § 510.  See Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988).  Thus, in order to establish a prima facie case, plaintiff need only show 1) he is in a protected group in that he has an opportunity to attain rights in a covered employee benefit plan; 2) he was qualified for his position; 3) the circumstances of his termination give rise to an inference that defendants terminated his employment to prevent him

---

[73] Interestingly, defendants did not obtain replacement LTD insurance coverage until the fall of 2004 and could not explain why they waited so long after mistakenly cancelling the LTD policy to obtain a replacement policy.  See Ex. 2 (H. Baker) at 68.  Moreover, defendants did not include LTD coverage in the job offer they made to plaintiff (in order to limit their damage exposure) in the summer of 2003.  See Ex. 27.

[74] As discussed *infra*, under certain circumstances, welfare benefit plans may become vested as well.  See Section III.D.2.

from attaining his ERISA benefit rights. <u>See</u> <u>Dister</u> at 1115 (paraphrasing). Once plaintiff meets his *de minimus* burden of establishing a prima facie case, defendants may dispel the inference that plaintiff was terminated in violation § 510 by articulating a legitimate reason, not motivated by the employer's desire to avoid providing benefit coverage. <u>See</u> <u>Dister</u> at 1114-15 (paraphrasing). Finally, if defendants articulate a legitimate reason for terminating plaintiff's employment, plaintiff then has the burden of proving that the proffered reason is simply a pretext for avoiding plaintiff's entitlement to benefit coverage. <u>Id.</u> (paraphrasing).

Plaintiff has met the *de minimus* burden of proving his prima facie case. The record evidence, described above, belies defendants' blanket statement that there is "no evidence" in support of plaintiff's § 510 wrongful termination claim. The only specific argument defendants make is that "there was no possibility of him losing benefits as the LTD Plan was properly extinguished two years prior to September 2002." Def.Mem. at 38. This argument, however, is without merit. As set forth above, the LTD Plan was in effect and self-insured when plaintiff was terminated in 2002. Alternatively, when plaintiff's employment was terminated, defendants had just learned that the Plan had been terminated by mistake in breach of their fiduciary duties and were under a duty at that time to correct their mistake. In either case, the termination of plaintiff's employment caused him to lose his right to attain coverage under the LTD Plan in violation of § 510.

Section 510 protects rights to welfare benefit plans which offer benefits that "do not 'vest' (at least insofar as ERISA is concerned)" because §510 specifically provides that an employer may not "'discharge . . . a [plan] participant or beneficiary for the purpose of interfering with the *attainment of any right* to which such participant may be entitled under [an ERISA plan].'" <u>Inter-Modal</u> at 514 (emphasis in the original). In <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), the Supreme

63

Court held that the term "plan participant" must be read "to mean either 'employees in, or reasonably expected to be in, currently covered employment,' . . . or former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." Id. at 117. See Inter-Modal at 514 (termination to prevent employee from obtaining any benefit to which he may become entitled under a welfare benefit plan is unlawful under § 510).

In sum, as the evidence shows, plaintiff has presented a triable claim that he was terminated in violation of § 510 to prevent his attainment of coverage and/or benefits under the LTD Plan and, therefore, summary judgment may not be granted against plaintiff on this claim.[75]

### 4. Plaintiff seeks appropriate equitable relief pursuant to 29 U.S.C. § 1132 (a)(3)

Defendants argue that summary judgment must be granted on plaintiff's claims for breach of fiduciary duties and  wrongful termination in violation of § 510 on the basis that plaintiff is not seeking appropriate equitable relief under § 1132(a)(3). See Def.Mem. at 29-33. In fact, plaintiff seeks appropriate equitable relief – i.e., reinstatement of his employment and reinstatement in the LTD Plan.[76]

---

[75] Plaintiff's claim for wrongful termination under §510 of ERISA may proceed even if it is determined that his other claims under ERISA are not viable. See, e.g., Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1321 (S.D.N.Y. 1993) (granting plaintiff summary judgment for statutory penalties where his employer had not responded to his request for a Summary Plan Description, court noted that "the class of 'potential participants,' those who have 'colorable claims' to benefits, clearly encompasses a larger group than just those individuals ultimately determined to have rights under a plan. A court may properly award statutory penalties under §502© [§1132©] even if it determines that the plaintiff does not qualify for plan benefits").

[76] With respect to his § 510 claim, plaintiff also seeks (in addition to reinstatement of his employment and reinstatement in the LTD Plan) back pay and front pay (if reinstatement is not feasible) Defendant argues that back pay is not an appropriate equitable remedy under ERISA, citing Millsap v. McDonnell Douglas Corporation, 368 F.3d 1246 (10th Cir. 2004). The Second Circuit, however, has not yet addressed whether in light of Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204 (2002), back pay is an available remedy for a § 510 violation. In plaintiff's view, the issue was wrongly decided by the Millsap majority. See Id. at 1261-66 (dissenting opinion); see also De Pace v. Matsushita Electric Corporation of America, 257 F.Supp. 543, 565 (E.D.N.Y. 2003) (front pay viable equitable

See Varity Corporation v. Howe, 516 U.S. 489, 515 (1996) (remedy of reinstatement of employees in benefit plan constituted "appropriate equitable relief" under ERISA); Griggs v. E.I. DuPont De Nemours & Company, 237 F.3d 371, 385 (4th Cir. 2001) (reinstatement of employment may constitute appropriate equitable relief for breach of fiduciary duties).

Contrary to defendants' argument and unlike the plaintiff in Coan v. Kaufman, 333 F.Supp. 2d 14, 25 (D.Conn. 2002), who was seeking "an order resurrecting the long-since-terminated Profit-Sharing and Rollover Funds and requiring those funds be augmented by cash to be supplied from the pockets of Defendants for the sole purpose of then distributing that additional money to Ms. Coan," plaintiff is seeking reinstatement of his employment and reinstatement in defendants' LTD Plan. If plaintiff is awarded this relief, he will again have the coverage the LTD Plan provides, but he will not receive LTD benefits unless he subsequently becomes disabled. As set forth above, it is plaintiff's position that the LTD Plan has never been terminated although it became self-insured when the LTD insurance was canceled in June 2000. Alternatively, plaintiff claims that defendants terminated the LTD Plan by mistake in breach of their fiduciary duties, that defendants reinstated the Plan at some point in time after they became aware of their mistake and that the Plan is now in effect. The relief sought in this case is, thus, like that approved by the Supreme Court in Varity, 516 U.S. at 495. See also Mathews v. Chevron Corporation, 363 F.3d 1172 (9th Cir. 2004) (order "instating" plaintiffs in a special involuntary termination plan constitutes appropriate relief under ERISA to cure defendants' fiduciary breach causing plaintiffs to be denied coverage under the plan).

---

remedy under § 1132(a)(3) when reinstatement not feasible); Russell v. Northrop Grumman Corporation, 921 F.Supp. 143, 152 (E.D.N.Y. 1996) (pre Great-West analysis of back pay as relief for § 510 violation; "[t]he courts that have recognized the equitable nature of back pay hold that it constitutes restitution in that it gives plaintiff 'the very thing that [he or she] would have received but-for the defendant's illegal action", or that it is incidental to an equitable reinstatement order").

In sum, summary judgment may not be granted on the basis that the relief plaintiff seeks is improper because plaintiff seeks appropriate equitable relief to cure defendants' violations of his rights under ERISA.

### 5.   Defendants refused to provide plaintiff with LTD Plan documents in violation of ERISA

Defendants also seek summary judgment on plaintiff's claim under 29 U.S.C. § 1132(c)(1) that defendants improperly refused to provide LTD Plan documents in response to his attorney's September 6, 2002 letter.  In support, defendants claim that plaintiff was not entitled to the documents he requested because plaintiff knew the LTD Plan had been terminated for two years before he requested plan-related documents and his sole reason for requesting the documents was to prepare for the instant case.  See Def.Mem. at 38-39.

Defendants' arguments depend upon a reading of the facts that is not supported by the record. Thus, contrary to defendant's claim, plaintiff did not know that the Plan had been terminated for two years when he requested Plan documents.  Rather, plaintiff knew that Mike Dunn had told him in July 2000 that he no longer needed to have new employees fill out the LTD insurance enrollment form.  When he asked Mike Dunn for an explanation, none was forthcoming.  Management, moreover, had not informed the employees, including plaintiff, that the LTD Plan or the LTD insurance coverage had been terminated.  Admittedly, plaintiff assumed, based on the limited information that he had been given, that his company LTD coverage had been terminated.  See BC Aff., ¶ 9.  However, in September 2002, plaintiff did not know what rights he had, if any, under the Plan and, in particular, what the Plan documents provided with respect to such issues as termination of the LTD coverage, including whether he had any conversion rights.

Likewise, when plaintiff requested the Plan documents on September 6, 2002, he was employed by defendants and, through his attorney, communicating with defendants' counsel with regard to concerns he had about discriminatory treatment and the termination of his LTD coverage. Defendants do not cite and there is no evidence to support the assertion that "the primary, if not sole, reason he requested the plan information was to prepare his law suit." Def.Mem at 39, quoting Sampson v. Rubin, 2002 WL 3143270,*11 (D. Mass. 2002).

Thus, the factual grounds defendants proffer in support of summary judgment on plaintiff's § 1132© claim are invalid. Contrary to defendants' argument, plaintiff is entitled to maintain the claim because, as set forth above, in September 2002 he was and he continues to be either an actual or a "potential participant" in the LTD Plan with a "colorable claim" to coverage under the Plan. See Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1321 (S.D.N.Y. 1993).

### 6.    Vermont Pure is a proper party

Defendants argue that summary judgment should be granted in favor of Vermont Pure Holdings, LTD. [Vermont Pure] in connection with plaintiff's claims for breach of fiduciary duties and for failure to provide documents on the basis that the merger occurred after the purported termination of the LTD Plan in June 2000 and, therefore, Vermont Pure was not a fiduciary or administrator of the Plan. See Def.Mem. at 39-40. In support, defendants cite to their Local Rule 56(a)(1) Statement: "Effective October 2000, 100% of the stock of both Crystal Rock and Vermont Pure was acquired by VP Merger Parent, Inc., which was later renamed Vermont Pure Holdings, LTD." Id. at ¶ 3. See also Jurasek aff. at ¶ 5. Plaintiff does not dispute that Vermont Pure did not exist until the merger occurred. However, as the cited evidence establishes, Crystal Rock became a wholly owned subsidiary of Vermont Pure in October 2000 and, at the very least, Vermont Pure is an appropriate, if not a necessary party in its