IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------- x
BRIAN CLARK,                      :   CIVIL ACTION NO.
    Plaintiff,                     :   3:02 CV 2278 (MRK)
                                  :
v.                                :
                                  :
VERMONT PURE HOLDINGS, LTD., ET AL. :
    Defendants.                    :
---------------------------------------------- x   JULY 1, 2005

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Local Rule 56(a)(2), plaintiff Brian Clark, through counsel, respectfully submits this statement of material disputed facts in response to defendants' Local Rule 56(a)(1) statement dated February 16, 2005 and supplemental statement dated May 10, 2005.[1]

1. Plaintiff does not dispute the facts set forth in Paragraph 1.

2. Plaintiff disputes any suggestion that Vermont Pure was "Vermont Pure Holdings, Ltd." prior to the merger, but does not dispute that Crystal Rock Spring Water Company announced, in May 2000, that it would be merging with Vermont Pure and that the two companies subsequently merged and formed Vermont Pure Holdings, Ltd.. See Affidavit of David Jurasek, submitted in conjunction with Def.Mem., ¶ 5.

3. Plaintiff does not dispute the facts set forth in Paragraph 3.

4. Plaintiff does not dispute the facts set forth in Paragraph 4.

5. Plaintiff does not dispute the facts set forth in Paragraph 5.

6. Plaintiff does not dispute the facts set forth in Paragraph 6.

7. Plaintiff does not dispute the facts set forth in Paragraph 7.

---

[1] All exhibits referenced herein are attached to the Affidavit of Attorney Kathryn Emmett in Support of Plaintiff's Opposition to Summary Judgment dated July 1, 2005 [KE Aff.], submitted herewith.

8.  Plaintiff does not dispute the facts set forth in Paragraph 8.

9.  Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 9 -- *i.e.*, that, as Sales Manager, he reported to Gene Monte and Peter Baker. Plaintiff disputes any suggestion in the second sentence that Monte's role was to provide him "support" because, as stated, he reported to Monte, but does not dispute that he was "uncomfortable" with the situation in the sales department for approximately 12-18 months after assuming the Sales Manager position in 1992 because he felt Monte did not provide him with "clear direction." See Ex. 1 (B. Clark) at 31-38 ("I wasn't getting clear direction from Gene on what was working and what wasn't working with regards to sales performance. I wasn't getting clear direction on the direction our sales efforts should take."). Plaintiff states further that, despite his discomfort during that time period, he continued to have a positive relationship with Monte, became comfortable in the Sales Manager position over time, and always felt his performance was at least acceptable to upper management until early 2000. See id. at 34, 43-44, 300. See also Ex. 2 (H. Baker) at 10-16 (Henry Baker, who ran the company from the 1950's to the early 1990's testifying that "[plaintiff] was extremely energetic, loyal, and probably the best employee [the company] had over the years."); Ex. 3 (P. Baker) at 16, 25, 33-34 (Peter Baker, who began working at the company in 1977 and to whom plaintiff reported as Director of Route Sales, testifying that he was pleased with plaintiff's performance in Route Sales and that, as Sales Manager, plaintiff was "a very compassionate leader" and "very devoted to the company"); Ex. 12 (Monte) at 26-27, 31-33; Ex. 14 (1997 evaluation by Gene Monte stating: "Over the many years that Brian has been with the company, he has consistently displayed team spirit, enthusiasm, good attitude and a desire to get the job done. . . . we could use more people like Brian at Crystal Rock, but they're hard to find.").

10. Plaintiff does not dispute the facts set forth in Paragraph 10.

11.  Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 11. Plaintiff disputes any suggestion in the second sentence that he believed his performance was unacceptable to management for 12-14 months prior to October 1999, but states that he did perceive some negativity with respect to his performance beginning in or about 1998 and refers to his response to Paragraph 12 *infra*. Plaintiff states that the facts set forth in the third sentence – *i.e.*, "Baker's comment was the first positive comment that Clark had heard during this period" – are extremely vague, but does not dispute that, when Baker made the comment to plaintiff in October 1999, plaintiff felt that it was the first "positive comment" that Baker had made to him concerning his performance "for quite awhile." See Ex. 1 (B. Clark) at 80-81.

12.  Plaintiff does not dispute the facts set forth in Paragraph 12 that Peter Baker and John Woermer developed a close relationship, that "[Woermer] had [Baker's] ear," and that, in or about February 2000, plaintiff became concerned that their relationship could negatively impact his position as Sales Manager, but disputes that he became "defensive" because they had a close relationship. Rather, as plaintiff testified at deposition, he perceived some negativity with respect to his performance beginning in or about 1998, after the tremors in his hands became visible to others, and, in particular, he noticed that Woermer would question the style or performance of certain individuals in the sales department and that Baker would then adopt Woermer's criticisms of those individuals. Ex. 1 (B. Clark) at 40, 58-60. See also plaintiff's response to ¶15, *infra*. Plaintiff states further that in early 2000, after he was diagnosed with Parkinson's disease in December 1999 and notified upper management of his disabling condition, the negativity increased noticeably, and it was only then that he began to feel that his performance was no longer acceptable to upper management. See Ex. 1 (B. Clark) at 40-43, 212-14, 299-300. It was at that time and in that context that he also became concerned that Baker's relationship with Woermer might

3

negatively impact his position as Sales Manager and, in particular, after he had lunch with Baker and Woermer in or about February 2000 and they "went on and on all afternoon" about "how much they had in common" and plaintiff sat there feeling "out of the loop." Ex. 1 (B. Clark) at 57.

13. Plaintiff does not dispute the facts set forth in Paragraph 13.

14. Plaintiff does not dispute that Crystal Rock appointed Woermer to replace him as Sales Manager after he transferred to the HR function. Plaintiff also does not dispute that Woermer was terminated effective November 19, 2001, in part, on the basis that his performance was unsatisfactory to upper management.

15. Plaintiff does not dispute the facts set forth in Paragraph 15 and states further that the tremors were noticeable to others for at least a year prior to his diagnosis with Parkinson's disease and that, in or about December 1998, Woermer even commented as he was walking by plaintiff's office "What, do you have Parkinson's or something?" See Ex. 1 (B. Clark) at 212-14; Ex. 3 (P. Baker) at 47-48 (he noticed tremors prior to plaintiff's diagnosis).

16. Plaintiff does not dispute the facts set forth in Paragraph 16 – that he was diagnosed with Parkinson's disease in December 1999 and that when he informed Peter Baker of his diagnosis, Baker initially acted supportive. See Ex. 1 (B. Clark) at 213.

17. Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 17 and states further that he asked to be considered for the HR position after Mike Dunn disclosed to him that upper management was planning to make a change in the sales department, that plaintiff was likely not to continue as Sales Manager post-merger, and that it would be, therefore, in his best interest or a "smart move" to consider requesting a transfer to the open HR Manager position. See Ex. 1 (B. Clark) at 67; Ex. 5 (S. Clark) at 11-12 (plaintiff's wife, Sally Clark, who was traveling in the car with plaintiff when he

received the phone call from Dunn on speaker phone, testifying that she also understood that Dunn "implied that [plaintiff] was not going to be in sales and that he should take the [HR] position."). Plaintiff credited Dunn's advice both because he believed that Dunn, as head of HR, was in a position to know what the staffing plans were post-merger and because plaintiff had been experiencing increasing criticism of his performance as Sales Manager, as set forth in response to Paragraph 12 *supra*, and had been left "out of the loop" with respect to the merger planning. See Ex. 1 (B. Clark) at 71-75, 106-107, 297-98. See also Ex. 5 (S. Clark) at 17-19 (Sally Clark, who also worked at Crystal Rock for many years, testifying that she believed Dunn's information was credible because, as personnel manager, he would be in a position to know about personnel changes at the company). Plaintiff does not dispute that Baker initially appeared reluctant to approve the transfer or the remainder of the facts set forth in Paragraph 17 and states further that he told Baker and he thought that the transfer was in his "best interests" for the reasons stated above. See id.

18. Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 18 and states further that:

- the merger between Crystal Rock and Vermont Pure was finalized in October 2000, approximately 3 months after plaintiff transferred into the HR position. See Ex. 3 (P. Baker) at 14; Ex. 7 (Fallon) at 9. As a result of the merger, the number of employees within plaintiff's responsibility nearly doubled from approximately 150 to 325; plaintiff was required to manually enter information relating to these new employees into the payroll database and assume responsibility for twice the number of employees on a daily basis. See Ex. 1 (B. Clark) at 110-12, 148-53; Ex. 3 (P. Baker) at 91, 96; Ex. 7 (Fallon) at 15; Ex. 30 (Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories), ¶8 (identifying number of Crystal Rock employees in 2000 as 149 and post-merger in 2001 as 323).[2]

---

[2] Like Mike Dunn before him, plaintiff was the only employee at Crystal Rock with responsibility for the HR function. See Ex. 3 (P. Baker) at 96-97. Vermont Pure also had one employee with HR responsibilities who was located in it Vermont office; however, as stated, after the merger, Crystal Rock's HR Manager assumed responsibility for the vast majority of the former Vermont Pure employees in addition to the existing Crystal Rock employees. See Ex. 1 (B. Clark) at 109-12.

5

   In addition, the company changed benefit plans and 3rd party administrators and established a new and uniform set of policies and procedures for the employees of both Crystal Rock and Vermont Pure resulting in voluminous paperwork, including new benefits' applications from all employees and numerous requests and questions from employees who were not familiar with the new plans or procedures. See Ex. 1 (B. Clark) at 112, 149, 152.

- Baker also assigned plaintiff responsibility for purchasing and installing a new telephone system for the company. See id. at 148.

- Furthermore, plaintiff was also responsible for the company's damage claims, which coincidentally dramatically increased after the merger because new water bottles used by the company leaked. See id. at 149-51, 291.

- Additional staff was hired to assist the Controller and the Customer Service Department because of the increased work load resulting from the merger, but not to assist plaintiff in HR, and plaintiff was inundated by work and had to work nights and weekends for weeks at a time and even enlisted his wife to assist him with his work after hours on occasion. See Ex. 1 (B. Clark) at 136, 149-54; Ex. 3 (P. Baker) at 96-97; Ex. 5 (S. Clark) at 33-34; Ex. 9 (Jurasek) at 13-16.

Plaintiff also does not dispute the facts in the second sentence and states further that he informed both Peter Baker and the company's Controller, David Jurasek, that he was overwhelmed by the workload and requested assistance and/or reassignment of certain responsibilities such as the damage claims, but they refused to make any changes to alleviate the burden other than by allowing a temporary employee who was assigned to another department to help plaintiff on an unpredictable basis when she was available. See Ex. 1 (B. Clark) at 135-36, 151-53, 291, 294-95; Ex. 3 (P. Baker) at 96-97, 108; Ex. 9 (Jurasek) at 30, 38. See also Ex. 16 (contemporaneous "talking points" memo prepared by plaintiff).[3] Finally,

---

[3] Even though they knew that the merger caused an increased workload for HR and that plaintiff was overwhelmed, upper management rejected his requests for help claiming that it wasn't financially feasible to hire additional help and/or that plaintiff should have been able to complete the work on his own and, in general, ignored and/or expressed irritation at plaintiff's requests for help even though he made it clear that he needed help in his new job position. See Ex. 1 (B. Clark) at 140, 151-53, 293-94. In plaintiff's experience, it was company practice to make an employee's work load intolerable as a means of getting a disfavored employee to leave voluntarily. See Ex. 31 (Plaintiff's Response to Defendants' Third Set of Interrogatories), Nos. 2, 4, 6-8.

plaintiff disputes that he "*assumes* he did not receive additional help because he company's resources were stretched following the merger," and states he assumed that *at the time*. See Ex. 1 (B. Clark) at 154 ("At the time, I assumed our resources were stretched.").

19.     Plaintiff does not dispute the facts set forth in Paragraph 19.

20.     Plaintiff does not dispute the facts set forth in Paragraph 20, refers to his response to Paragraph 18, and states again that that was his perception at the time. See Ex. 1 (B. Clark) at 139-40, 156.

21.     Plaintiff does not dispute that he felt that Jurasek did not provide him with the support he would have liked "on a couple of occasions" when he was Sales Manager, but disputes any suggestion that he perceived any hostility from Jurasek prior to becoming HR manager. See Ex. 1 (B. Clark) at 139-42 (testifying that when he was Sales Manager, he felt Jurasek was unsupportive on "a couple of occasions" in that he "didn't get an answer" or "got a question back," but that overall they did not have a lot of interaction when he was Sales Manager and that they "got along okay").

22.     Plaintiff does not dispute the facts set forth in Paragraph 22, but disputes any suggestion that Jurasek's behavior in screaming at him was warranted or that Baker took any action to calm Jurasek down and refers to his deposition testimony concerning the severity of the incident. See Ex. 1 (B. Clark) at 218-19 ("The first occasion [when Jurasek yelled at me] was a result of his requesting all bills be paid by the end of the fiscal year, October 31st, all outstanding bills. I had on my desk a disputed bill with the Southern New England Telephone Company . . . for $3,000 in erroneous charges which I knew at some point would be credited to us; however, it occurred to me that he – he might want that bill. And it was in November, and I walked into his office one day with this bill. I said, David, I think I said something like, Don't kill me for this, but this bill is outstanding, and I neglected to present it to you prior to October

7

31ˢᵗ, but it's in dispute. And he began a tirade. I'm not sure he didn't call me stupid, but he yelled as loud as he could possibly yell in an open office with the entire customer service and sales and every other employee in the main work area, in earshot of everybody. Everybody heard it. . . . It lasted for several minutes. It seemed like minutes, and I'm sure it was several minutes. It was nonspecific, and it was personal, absolutely personal. . . . Peter came into Dave's office in the heat of Dave's yelling, and the first thing he did respectfully was close the door. Dave continued to yell a bit longer and then did calm down with Peter present. . . .).

23. Plaintiff does not dispute that Jurasek yelled at him in an offensive and unwarranted manner a second time after he made arrangements to have a crew come into the office to clean employees' dirty chairs at the request of the then office manager and with Peter Baker's approval and refers to his deposition testimony concerning the incident. See Ex. 1 (B. Clark) at 221-24 ("And he was -- he was yelling again, not so personal this time, but yelling at the fact that I did not -- I usurped his authority or I circumvented his instructions or something to that effect because I had made arrangements for the crew to come in, and they weren't going to clean just seven chairs."). Plaintiff also does not dispute that he testified that he does not believe that Baker consciously wanted Jurasek to yell at him, but states further that when he complained to Baker about Jurasek's behavior, Baker did not respond in any significant way. See id. at 225-27. See also Ex. 20.

24. Plaintiff disputes that he had "heated discussions" with Peter Baker "in which they both raised their voices" and states that, while he had work-related disagreements with Baker on occasion and discussions with Baker that were, at times, emotional, to the best of his recollection, he did not at any time raise his voice to Baker. See Affidavit of Brian Clark dated July 1, 2005 [BC Aff.], submitted herewith, ¶ 4. Plaintiff states further that Baker raised his voice to plaintiff on at least one occasion, in or

8

about August or September 2001, relating to the installation of new telephone service and in the presence of other coworkers. See id.

25.  Plaintiff does not dispute the facts set forth in Paragraph 25 and states further that he received the same performance bonus -- $8,000 -- in both 1999 *and* 2000 and that he and all "original" employees of Crystal Rock received a one-time matching bonus in 2000 in connection with the merger. See Ex. 3 (P. Baker) at 38-39; Ex. 17; Ex. 18.

26.  Plaintiff does not dispute the facts set forth in Paragraph 26 and states further that he learned that his bonus had been cut in half, in or about November 2001, when Peter Baker handed him a sheet on which Baker had listed the amounts of the 2001 bonuses to be paid to employees identified by Baker on the list as key managers, including plaintiff, without any explanation whatsoever. See Ex. 3 (P. Baker) at 132-35. The list reflected that plaintiff's bonus had been cut in half, while the bonuses awarded to the other key managers had either remained the same or increased, with the exception of one manager, Craig Kavanaugh, whose bonus had been reduced but not to the same extent as plaintiff's. See id.; BC Aff., ¶ 5; Ex. 18. Plaintiff attributed the fact that Kavanaugh's bonus had been reduced to the fact that during 2001, Kavanaugh, who had an arthritic condition in his hip, had transferred out of his key manager position as Route Supervisor to the less valued position of Plant Manager. See BC Aff., ¶ 5.

27.  Plaintiff does not dispute that he planned to move to Florida when he retired or the remainder of the facts set forth in Paragraph 27. See Ex. 1 (B. Clark) at 113-14, 173-74. See also Ex. 5 (S. Clark) at 7-11 (she and plaintiff hoped to retire to Florida at "retirement age. . . 65, 72, whenever funds would permit.").

28.  Plaintiff does not dispute that, in November 2001 when plaintiff was just 49 years old, Baker called him into his office and suggested that the company might be able "to make [his] dreams

9

come true" if he would consider retiring to Florida at that time, but disputes any suggestion that Baker made an offer of a specific "retirement package," and states further that Baker testified at deposition, and others confirmed, that he made the suggestion that plaintiff retire at age 49 *because of his Parkinson's disease and age.* See Ex. 1 (B. Clark) at 173, 303; Ex. 3 (P. Baker) at 118-21 (". . . he was struggling with his job, and with his diagnosis. I wondered if, you know he was working here because he thought he had to, and he had to reached [sic] his goal of 55 before he could go, and I thought maybe if there would be a way to put something together that might allow him to go earlier if that's what he wanted to do."); Ex. 9 (Jurasek) at 64-66 (Baker told him he thought plaintiff would be interested in retiring at age 49 because of his Parkinson's diagnosis); Ex. 11 (Miller) at 205-6 (Baker told her that plaintiff "wanted to retire" and "wanted to go to Florida" and that plaintiff was "getting older, he had Parkinson's and that [Baker] – you know, he thought it would be a nice – it would be a good thing to do. He wanted to make it work for [plaintiff] if he could."). Plaintiff does not dispute that he immediately responded to Baker that he was not interested and had no intention of retiring at that time and states further that he was completely taken aback by the suggestion because he did not plan to retire for a number of years and could not, in any case, afford to retire at that time. See Ex. 1 (B. Clark) at 113-14, 173-74; Ex. 6 (S. Clark) at 23 (plaintiff was surprised by Baker's suggestion that he retire because he wasn't ready and "didn't know what that meant"). See also Ex. 3 (P. Baker) at 120 (". . . basically he said that he was going to continue with his job. He wanted to do his job the right way, and he had no intentions of going earlier, and I said, 'Fine.'").

    29.     Plaintiff does not dispute that he inquired of Peter Baker what he meant when he said that he could "make plaintiff's dreams come true," refers to his Statement of Facts concerning the adverse treatment to which he had been subjected by management over the previous months, and states that he

made the inquiry because he became unable to tolerate management's hostility toward him and had concluded that management wanted him to leave the company. See Ex. 1 (B. Clark) at 177-79, 185-86, 309. Plaintiff states further that Baker did not seem surprised and responded that he would have to think about a package and get back to plaintiff. See id. at 178-79. Finally, contrary to the facts set forth in Paragraph 29, plaintiff testified that to the best of his recollection he made the inquiry at the beginning of February 2002. See id. at 178.

30.     Plaintiff does not dispute that Peter Baker and Jurasek subsequently met with him and offered him a payment of one week of severance for each year of his service to the company (*i.e.*, 30 weeks) if he retired from Crystal Rock and that they also suggested that if he had difficulty getting health insurance coverage after his COBRA coverage expired, he could "use the power of Crystal Rock to obtain health insurance." See Ex. 1 (B. Clark) at 182-83. See also Ex. 3 (P. Baker) at 139; Ex. 9 (Jurasek) at 87-88. Plaintiff disputes that the payment defendants offered him was, in fact, a "retirement package" because it was not designed to allow him to retire from his career at age 49 and states that it was more consistent with a "severance package" paid to a departing employee, including at times those terminated for cause, to provide them with a cushion while they seek alternative employment. Plaintiff does not dispute that he "reached the conclusion [that he had to leave Crystal Rock] in the meeting" because it was apparent that management no longer wanted him there and he believed he had no choice but to leave the company. See Ex. 1 (B. Clark) at 183-88, 197-98, 203. Plaintiff states further that, at the meeting, he told Baker and Jurasek that it was clear to him that they did not "want [him] there anymore," and neither refuted the statement and that Baker and Jurasek even acknowledged that they had been exhibiting hostility toward plaintiff, commenting that they knew "two people [who plaintiff wasn't] going to miss" when he left Crystal Rock. See Ex. 1 (B. Clark) at 184-86, 304. See also Ex. 3 (P.

11

Baker) at 136 (he doesn't recall whether plaintiff stated that they didn't want him to stay at the company). Plaintiff disputes, however, that he decided to relocate to Florida during the meeting and states that it was after the meeting and in or about February or March 2002 that he began considering relocating to Florida and going into business with his son. See Ex. 1 (B. Clark) at 115-16, 188. See also Ex. 6 (S. Clark) at 22 (plaintiff started to explore options in Florida after he "felt that Peter [Baker] didn't want him there . . . He had conversations with Peter that Peter didn't want him there."); Ex. 9 (Jurasek) at 66-67 (plaintiff first expressed to him a desire to move to Florida and open a restaurant after management offered him a severance package).

31. Plaintiff, once again, disputes the characterization of defendants' offer as a "retirement package" for the reasons set forth in response to Paragraph 30 and states that he was disappointed with the amount of the severance that Baker and Jurasek offered him because, even though Baker had initially stated that he could "make [plaintiff's] dreams come true" if he would consider retiring to Florida at that time, the severance defendants offered was no greater than the severance Crystal Rock paid to employees who were terminated *for cause* by the company and was not, contrary to Baker's suggestion, designed to allow plaintiff to retire. See Ex. 1 (B. Clark) at 192-97. Plaintiff states further that he was never informed that he was being terminated for cause and he did not *want* to leave; rather, he perceived that he was being forced out by management after almost 30 years of dedicated service to the company and refers again to his response to Paragraph 30. See id. Plaintiff does not dispute that he expressed disappointment with defendants' offer to Jurasek, but states that he did so on *two* subsequent occasions, explaining that he thought the offer was "unfair because they had given a similar package or a better package to two employees that had been terminated for cause" by the company. Id. Finally, plaintiff does not dispute that he was hoping that defendants would increase their offer because he knew

management no longer wanted him there and believed he had no choice but to leave the company, but could not afford to leave on the proposed terms. See id. at 194, 207-8.

32.     Plaintiff does not dispute the facts set forth in Paragraph 32, states further that he discussed leaving by the end of the year because he knew management no longer wanted him there and believed he had no choice but to leave the company and refers to his response to Paragraphs 30 and 36. See Ex. 1 (B. Clark) at 183-88, 197-98, 203.

33.     Plaintiff does not dispute that he had a conversation with his son about the possibility of moving to Florida and buying a bar together in February or March 2002 after he had the severance discussion with Baker and Jurasek described in Paragraph 30 and states further that he subsequently "traveled to Florida with his son in June 2002 to investigate [one] closed restaurant that was for sale with the intention that, if he was able to purchase the business and work out departure terms with Crystal Rock, his son would operate the restaurant until plaintiff could join him in January 2003," but disputes the suggestion that he was actively "investigating this and other possible business opportunities in Florida" at that time refers to his response to Paragraph 32 and 36. See Ex. 1 (B. Clark) at 115-16, 172-73; Ex. 31 (Plaintiff's Response to Defendants' Second Set of Interrogatories), ¶ 13.

34.     Plaintiff does not dispute that he told coworkers that "[he] was probably leaving Crystal Rock by the end of the year" at the lunch and that he thought he and his son were going to try to open a bar or restaurant and refers to his response to Paragraphs 30, 32, 33 and 36. See Ex. 1 (B. Clark) at 203.

35.     Plaintiff does not dispute the facts set forth in Paragraph 35.

36.     Plaintiff does not dispute the remainder of the facts set forth in Paragraph 36, but states further that he approached Baker in the late spring because he had not heard back from defendants following his discussions with Jurasek [see response to Paragraph 31] and, once again, reiterated his

13

belief that defendants' offer was unfair; plaintiff states further that Baker responded "how do you know that's all we were going to do for you?" and made some "reference to COBRA," but that plaintiff did not derive from what he said that defendants were offering to pay for his COBRA coverage. See Ex. 1 (B. Clark) at 198-201. During the meeting, Baker also suggested to plaintiff that his father, Henry Baker, might be willing to provide funding to plaintiff to purchase a restaurant in Florida. See Ex. 1 (B. Clark) at 201-205. See also Ex. 3 (P. Baker) at 145-46. Baker said his father would be in Florida in the near future and that he would make an effort to meet with plaintiff to see one particular business that plaintiff was interested in with the intention that, if he was able to purchase the business and work out departure terms with Crystal Rock, his son would operate the restaurant until plaintiff could join him in January 2003, as set forth in response to Paragraph 33 *supra*. See Ex. 1 (B. Clark) at 205. Plaintiff, in fact, traveled to Florida to meet with Henry Baker, but the meeting did not take place and Peter Baker later told plaintiff that his father had decided he would not lend money to plaintiff because he did not want to jeopardize their relationship. See Ex. 1 (B. Clark) at 205-206. See also Ex. 2 (H. Baker) at 43-48 (testifying that he recalls one of his sons asking him if he would consider lending plaintiff money to purchase a restaurant, but that he ultimately decided it wasn't a good idea and that no one ever informed him that plaintiff was expecting to meet with him in Florida).

37.     Plaintiff disputes the facts set forth in Paragraph 37. As set forth in response to Paragraph 36, about ten days later, Peter Baker told plaintiff that his father would not lend money to plaintiff as part of an increased severance package. Because Peter Baker did not say anything further, plaintiff concluded that Crystal Rock management was not going to improve its severance offer. See Ex. 1 (B. Clark) at 207-8. Plaintiff then informed management that he did not "think [he] could afford to go" based on the proposed terms. See Ex. 1 (B. Clark) at 207-9. See also Ex. 3 (P. Baker) at 140.

14

Defendants did not respond with an increased offer or express to plaintiff that he was welcome to stay, and plaintiff believed that management "thought [he] would just quietly go away." See Ex. 1 (B. Clark) at 207-10 ("I felt I was not able to satisfy my superiors in my job. I had had my bonus cut in half in November. I had had Peter constantly on me about problems with the phone system, and I had Dave Jurasek yelling at me, and I had had Peter in November say to me, you know, What do you think about retiring? We came to Florida in January to celebrate my sister's birthday, and we visited my in-laws, and I was troubled, and I told this series of events that occurred, and my father-in-law – I told my father-in-law, and he said that – you know, he said simply that, I think they want you gone. And I had a hard time believing that, but I also shared with my brother and brother-in-law in that same weekend the story. I wasn't one to talk about work to anybody, but they knew I was pretty troubled by what was going on by the way I thought I was being treated. And my father-in-law in the course of the conversation said he had some similar experience in a previous position, and he wished that he had sought counsel. And so he made a suggestion that I might consider that at some point. Take it up to a point in June or whenever, sometime after the last meeting with Peter when I thought that this is not going to go anywhere, that I believed that they thought I would just quietly go away, and I decided to seek the advice of counsel.").

38.     Plaintiff does not dispute the facts set forth in Paragraph 38 and states further that he and his wife decided to list their primary residence in Waterbury, Connecticut for sale in June 2002 for several reasons including that they were ready to downsize and wanted fewer maintenance responsibilities and plaintiff was unsure whether he would continue working at Crystal Rock under the circumstances and wanted less financial burden. See BC Aff., ¶ 8. Plaintiff states further that he and his wife had alternate living arrangements in the area in the event their house sold and he continued to work at Crystal Rock – in particular, they owned a condominium in Waterbury, Connecticut and also had a neighbor who was

willing to lease space to them on an immediate basis. See id. See also Ex. 1 (B. Clark) at 179-81; Ex. 5 (S. Clark) at 21-24 (plaintiff explored business opportunities in Florida after it became apparent that Crystal Rock management wanted him to leave, but she and plaintiff made the definite decision to relocate to Florida only after Crystal Rock terminated plaintiff's employment).

39.  Plaintiff does not dispute the facts set forth in Paragraph 39.

40.  Plaintiff does not dispute that he did not formally complain to upper management that he believed he was being discriminated against by them on the basis of his disability and/or age prior to the August 2, 2002 letter, but states that he did complain about and/or question the reasons for several specific instances of adverse treatment and that Crystal Rock management was aware that plaintiff thought, but did not refute that, they wanted him to leave the company. See e.g., Ex. 1 (B. Clark) at 101 (Baker seemed increasingly unhappy with plaintiff's performance beginning in early 2000 and, when plaintiff inquired why, Baker responded only that he had "heard some things," but refused to elaborate further), 136 (plaintiff complained repeatedly to Peter Baker and Jurasek that he was overwhelmed with work in the HR function), 179 (plaintiff went to Peter Baker and said he had "had it" or words to that effect and inquired what Baker meant when he said he could "make [his] dreams come true" by allowing him to retire early to Florida), 184-86 (plaintiff stated to Peter Baker and Jurasek that it was "clear to [him] that they didn't want [him] there anymore" and they did not refute that that was the case and even acknowledged that they had been exhibiting hostility toward plaintiff, joking that they knew "two people [who plaintiff wasn't] going to miss" when he left Crystal Rock), 225-27 (when plaintiff complained to Peter Baker that Jurasek had yelled at him a second time, Baker failed to respond in any significant way), 301-2 (when plaintiff questioned Peter Baker about the fact that he was excluded from merger planning, Baker brushed him off). See also Ex. 3 (P. Baker) at 108 (acknowledging that plaintiff complained about

the workload), 123 (testifying that he was aware that Jurasek yelled at plaintiff about the disputed telephone bill, but that he doesn't recall whether he discussed it with plaintiff afterwards), 136 (he doesn't recall whether plaintiff stated that they didn't want him to stay at the company); Ex. 9 (Jurasek) at 30 (testifying that plaintiff "felt he was overwhelmed with the amount of work" and that he suggested plaintiff create a written proposal for restructuring, but admitting that nothing ever happened as a result), 38 (admitting that plaintiff repeatedly requested additional staff).

41. Plaintiff does not dispute the facts set forth in Paragraph 41 and states that he does not claim that he was "forced" to transfer to the HR manager position, but rather, as set forth in his Statement of Facts, that Mike Dunn, who was the departing head of HR, suggested to plaintiff that he should consider transferring to the HR position because he was likely not to continue in the Sales Manager position after the merger, that plaintiff credited Dunn's advice – both because Dunn was in a position to know what the staffing plans were and because plaintiff had been experiencing increasing criticism of his performance as Sales Manager -- and that, as a result, plaintiff asked to be considered for and was given the HR position. See Ex. 1 (B. Clark) at 67, 71-75, 96, 101, 106-107, 297-98; Ex. 5 (S. Clark) at 17-19. Plaintiff states further that, when plaintiff requested the transfer, Peter Baker did not communicate to plaintiff in any way that he was a valuable member of the sales' management team or that he should not leave the Sales Manager position and approved the transfer, but told plaintiff that he "better not do in HR what he did in sales" and said nothing when plaintiff asked him what he meant by the comment. See Ex. 1 (B. Clark) at 96-101; Ex. 3 (P. Baker) at 69-73, 96.[4]

---

[4] Plaintiff states further that in the August 2, 2002 letter by which he complained to defendants about their adverse treatment [Ex. 22], counsel for plaintiff incorrectly described the circumstances leading to plaintiff's transfer to the HR by stating that, when the sales department was reorganized, plaintiff "was not promoted or assigned to a comparable position in sales, but rather was offered the position of Human Resources manager and advised by Mike Dunn, the departing HR Manager, that he should accept the

17

42.     Plaintiff disputes that Crystal Rock management actually believed or had any reasonable basis for believing that his claims were "unfounded" and/or made in bad faith, but does not dispute that management has taken that position in an attempt to provide a non-discriminatory explanation for their subsequent termination of his employment. Plaintiff states further that the following evidence, *inter alia*, contradicts defendants' claim that upper management believed plaintiff's claims were "unfounded": 1) management could not point to any material inaccuracies in the August 2, 2002 letter; 2) plaintiff had been a dedicated employee of the company for almost thirty years whom Henry Baker described as "loyal, and probably the best employee [Crystal Rock] had over the years," and 3) plaintiff had never given management any reason to question his veracity or truthfulness previously over that thirty year period. See Ex. 2 (H. Baker) at 15-16. See also Ex. 3 (P. Baker) at 163-92, 209-11, 216; Ex. 7 (Fallon) at 43-58, 84; Ex. 9 (Jurasek) at 36-43.[5] Furthermore, Peter Baker and David Jurasek, who were both

---

position because his job as Sales Manager would soon be eliminated." Id. As stated, plaintiff, in fact, requested and was transferred to the HR position after being told by Dunn that management was planning to make a change in the sales department and that his future in the department was uncertain and Baker then appointed Woermer to assume plaintiff's previous responsibilities as Sales Manager without adding any additional upper level management staff to fulfill *Woermer's* prior functions in the department. See Plaintiff's Memorandum of Law in Opposition to Summary Judgment [Pl.Mem. or Memorandum], Statement of Facts. Upon learning that she had incorrectly described these events, counsel for plaintiff immediately notified counsel for defendants of her misunderstanding and the correction. See KE Aff., ¶ 2. See also Ex. 11 (Miller) at 82-83 (then counsel for defendants testifying that she does not recall whether plaintiff's counsel informed her of her misunderstanding).

[5] Members of Crystal Rock management testified at deposition that two facts only, as stated in the August 2nd letter, were inaccurate – in particular, that plaintiff's Sales Manager position was not "eliminated" (but see n.4 *supra*, regarding counsel for plaintiff's immediate correction of the misstatement which was based on a misunderstanding between plaintiff and his counsel) and that plaintiff was not "advised by management that when an employee was no longer wanted at the company, the employee should not be terminated but rather should be subjected to working conditions that were so difficult or intolerable that the employee would choose to leave." See id. Although Crystal Rock management disputes that this occurred, they never questioned plaintiff about the basis for and/or investigated the claim, and plaintiff maintains that the claim is accurate. See Ex. 3 (P. Baker) at 172-74; Ex. 9 (Jurasek) at 37-38; Ex. 31 (Plaintiff's Response to Defendants' Third Set of Interrogatories), Nos. 2, 4, 6-8.

involved in the decision to terminate plaintiff's employment in response to his claims, testified at deposition that the sole basis for asserting that plaintiff's complaints were unfounded or made in bad faith is that management purportedly did not share plaintiff's perception that he was being discriminated against. See Ex. 3 (P. Baker) at 231-32 (testifying that the only basis for claiming that plaintiff's claims were made in bad faith is that he does not agree that plaintiff was being discriminated against); Ex. 9 (Jurasek) at 134-35 (management did not give any consideration to addressing plaintiff's perception that he was being discriminated against because it was his perception and not theirs), 212.

43. Plaintiff does not dispute the facts set forth in Paragraph 43.

44. Plaintiff disputes that he never felt that Crystal Rock management treated him with hostility because of his Parkinson's disease and refers, *inter alia*, to Exhibit 22 and his complaint in this action. Plaintiff does not dispute that, when he informed upper management of his diagnosis in November 1999, they were initially supportive and that upper management never made any negative comments directly to him about his disabling condition. See Ex. 1 (B. Clark) at 214-15, 272-73.

45. Plaintiff does not dispute the facts set forth in the first sentence of Paragraph 45 and states further that Baker handed plaintiff a letter from counsel for Crystal Rock terminating his employment ostensibly for cause [see Ex. 24] and told plaintiff that he had "gotten some bad advice" before stating to plaintiff that he could continue working for Crystal Rock if he would simply retract his claims in the August 2, 2002 letter, but that Baker did not reassure plaintiff that upper management was not trying to force him out of the company and/or acknowledge plaintiff's concerns set forth in the letter in any way. See Ex. 1 (B. Clark) at 228; Ex. 3 (P. Baker) at 216-18 (admitting that he told plaintiff that he could continue working at Crystal Rock if he would retract his claims in the August 2, 2002 letter and stating that he was not concerned that plaintiff would feel uncomfortable continuing to work at Crystal Rock